Wes Felix (#6539)
NCHW LAW
68 S. Main Street, Suite 1100
Salt Lake City, Utah 84101
Tel: (801) 554-4110
wes@nchwlaw.com

*Attorney for the Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ROGER WILSON, an individual; RAYMOND BOMBEN, an individual; OWENA BOMBEN, an individual; JOHN BOSSHARD, an individual; SOPHANARITH CHEA, an individual; SHERMAN FREEZE, an individual; SANDRA FREEZE, an individual; CASSANDRA FREEZE, an individual, LUCY A. GROETSCH, an individual; ROBERT MICHAEL SAYERS, an individual; WILFRED SINDON, an individual, and Craig MARSDEN an individual,<br><br>                Plaintiffs,<br><br>vs.<br><br>MILLCREEK COMMERCIAL PROPERTIES, LLC, a Utah limited liability company; MILLROCK INVESTMENT FUND 1, LLC, a Utah limited liability company; COLLIERS INTERNATIONAL, a business operating in Utah under a dba; EQUITY SUMMIT GROUP P.C., a Utah corporation; BRENT SMITH, an individual; KEVIN G. LONG, an individual; ANDREW BELL, an individual; SCOTT RUTHERFORD, an individual; MARK MACHLIS, an individual; GREEN IVY REALTY, INC., a Utah corporation; and DOES 1-10, individuals or entities, | **SECOND AMENDED COMPLAINT**<br><br>**[JURY DEMAND]**<br><br><br>Case No. 2:24-cv-00624-TC-CMR<br><br>Judge Tina Campbell<br><br>Magistrate Judge Cecilia M. Romero |

Plaintiffs Roger Wilson; Raymond Bomben; Owena Bomben; John Bosshard III; Sophanarith Chea; Sherman Freeze; Sandra Freeze; Cassandra Freeze; Lucy A. Groetsch; Robert Michael Sayers; Wilfred Sindon, and Craig Marsden, through undersigned counsel, hereby complain, and allege against Defendants Millcreek Commercial Properties, LLC; Millrock Investment Fund 1, LLC; Colliers International; Equity Summit Group P.C.; Brent Smith; Kevin G. Long; Andrew Bell; Scott Rutherford; Mark Machlis; Green Ivy Realty, Inc.; and Does 1-10 as follows:

## INTRODUCTION AND BACKGROUND

1.    Defendants conspired with one another to engage in a nation-wide scheme to defraud Plaintiffs and others by inducing them to invest in tenant-in-common ("TIC") interests in commercial properties bundled with sham long-term leases (the "Colliers/Millcreek Scheme"). The properties were sold at multiples of the actual value of the real estate to unsuspecting, often elderly individuals.  The inflated prices of the properties were concealed by insuring significant returns to the investors through guaranteed long-term leases.  Defendants knew the lessors behind the leases were shell entities with no substantive assets.  Defendants knew there was no economic basis for the lease terms and that there was no reason to believe that the lessor shell entities would be able to perform on the leases.  This information was hidden from purchasers.

2.    In addition, to support the deception of the sham leases, Defendants paid "rents" with investor money.  Without using investor money to pay "rents" to new investors, the Colliers/Millcreek Scheme would have immediately collapsed, and the fraud would have been revealed.

3.    Typically, leases were executed and guaranteed by shell entities known to the Defendants to be incapable of performing under the terms of the leases. In addition, Defendants

2

falsely represented that the leases were supported by bonds, specifically including Lloyds of London. These guarantees induced and were relied upon by the investors.

4.      In this case, Plaintiffs purchased TIC interests in commercial properties from Defendants in the following locations: Keller, Texas; Crockett, Texas; Romeoville, Illinois; Naperville, Illinois; Bluffdale, Utah; Draper, Utah; Kennesaw, Georgia; and Pine Bluff, Arkansas. The Plaintiffs' investments totaled at least $10,789,965.17.

5.      The purchase price for the TIC investments was marketed by Defendants as safe and reasonable based upon long term lease agreements with, among others, HealthCare Solutions Holdings Inc. ("HSH"). Investors were told by Defendants that the investments would have risk free returns of between 6% and 9%.

6.      As an example, Scott Rutherford in 2021 solicited purchases from the Bombens. He represented that the tenants were all financially sound and that they had been thoroughly vetted by Kevin Long and Millcreek professionals. Rutherford represented that the investments were "turn key" and that there would be immediate ROI in the form of rents. He represented that each of the properties sold by Millcreek were ready to support the operations of an active long term-tenant and that the investment would be completely passive featuring triple-net leases and no investor maintenance or management responsibility.

7.      Rutherford represented, as did Long, Smith, Bell and Machlis, that each of the Millcreek properties being sold as TIC investments were "high-quality commercial properties under corporate-guaranteed leases (correlates to safety, security, reliability, passivity, etc.)".

8.      In fact, all the properties were sold at grossly inflated prices and Defendants knew that the tenants were not viable financially and that lease payments would either never happen or would cease in short order. Indeed, each named Defendant knew that Plaintiffs' investments

would be skimmed off in undisclosed fees and kickbacks and that Plaintiffs would be left holding worthless or near worthless TIC interests.

## PARTIES

**Plaintiffs**

9.      Plaintiff Roger Wilson is an individual residing in King County, Washington. At all relevant times, Roger Wilson was the principal of Wilson Real Estate Management, LLC, Wilson Real Estate IV, LLC, Wilson Real Estate V, LLC, Wilson Real Estate VII, LLC, and Wilson Real Estate VIII, LLC. Together, these entities and Roger Wilson will be referred to singularly as "Wilson" or "Plaintiff Wilson".

10.      Plaintiffs Raymond and Owena Bomben are individuals residing in Northridge, California. At all relevant times, Raymond and Owena Bomben were Trustees of The Raymond and Owena Jean Bomben Family Trust (the "Bomben Family Trust"). Together, Raymond Bomben, Owena Bomben and the Bomben Family Trust will be referred to singularly as "Bomben" or "Plaintiff Bomben".

11.      Plaintiff John Bosshard III is an individual residing in McCarthy, Alaska. At all relevant times, John Bosshard III was the Trustee of the John Bosshard III Revocable Trust, dated March 16, 2016 ("Bosshard Trust"). Together, John Bosshard III and the Bosshard Trust will be referred to singularly as "Bosshard" or "Plaintiff Bosshard".

12.      Plaintiff Sophanarith Chea is an individual residing in Bakersfield, California. Hereafter, Sophanarith Chea will be referred to singularly as "Chea" or "Plaintiff Chea".

13.      Plaintiffs Sherman and Sandra Freeze are individuals residing in Salt Lake County, Utah. At all relevant times, Sherman and Sandra Freeze were Trustees of the Sherm G. Freeze

and Sandra L. Freeze Trust (the "Freeze Trust").  Together, Sherman and Sandra Freeze and the Freeze Trust will be referred to as "Freeze" or "Plaintiff Freeze".

14.    Plaintiff Cassandra Freeze is an individual residing in Salt Lake County, Utah.  At all relevant times, Cassandra Freeze was a Trustee of the J. Bradley Freeze and Cassandra G. Freeze Trust (the "Cassandra Freeze Trust").  Together, Cassandra Freeze and the Cassandra Freeze Trust will be referred to singularly as "Cassie Freeze" or "Plaintiff Cassie Freeze".

15.    Plaintiff Lucy A. Groetsch is an individual residing in Santa Rosa, California.  At all relevant times Lucy A. Groetsch was a Trustee of the Lucy A. Groetsch Trust (the "Groetsch Trust").  Together, Lucy A. Groetsch and the Groetsch Trust will be referred to singularly as "Groetsch" or "Plaintiff Groetsch".

16.    Plaintiff Robert Michael Sayers is an individual residing in Santa Rosa, California. At all relevant times, Robert Michael Sayers was the Trustee of the Robert Michael Sayers 2003 Trust (the "Sayers Trust").  Together, Robert Michael Sayers and the Sayers Trust will be referred to singularly as "Sayers" or "Plaintiff Sayers".

17.    Plaintiff Craig Marsden is an individual residing in Springville, Utah. Hereafter Craig Marsden will be referred to singularly as "Marsden" or "Plaintiff Marsden".

18.    Plaintiff Wilfred Sindon is an individual residing in McCall, Idaho.  Hereafter, Wilfred Sindon will be referred to singularly as "Sindon" or "Plaintiff Sindon".

19.    Together, Wilson, Bomben, Bosshard, Chea, Sherman and Sandra Freeze, Cassie Freeze, Groetsch, Sayers, Marsden and Sindon will be referred to as "Plaintiffs."

**Defendants**

20.    Defendant Millcreek Commercial Properties, LLC ("Millcreek") is a Utah limited liability company with its principal place of business in Salt Lake County, Utah.

21.    Defendant Millrock Investment Fund 1, LLC ("Millrock") is a Utah limited liability company.

22.    Millrock provided capital for the purchase of properties to be marketed by Millcreek. Millrock and its principals, including Smith and Long, knew that properties would be purchased at a fraction of the sales price to investors.  Sometimes the properties were sold several times in quick succession to mask the profits skimmed off the top by Millrock before the property was sold to Plaintiffs.  Millrock and Long and Smith knew the scheme was designed to inflate the TIC sale value of the property through obtaining long-term leases from sham tenants who never had the financial ability to support the obligations of the long-term leases.  These sham tenants shared fraudulent profits taken from the initial "internal" sales of the properties.

23.    The fraud was deliberately hidden by Long, Bell, Smith, Rutherford and Machlis. Instead, the TIC investments were represented to be stable, safe and without worry.  Rutherford for example, in an email to Ray Bomben stated that:

> Kevin Long, Millcreek president, has been a commercial real estate broker for decades and has worked with all of those tenants you mentioned. He is the former principal broker for Coldwell Banker Commercial Advisors, growing that company exponentially nationwide into the largest Coldwell Banker franchise in the world prior to negotiating its acquisition by Colliers International. Kevin hand selects every property, surrounded by an acquisition committee that includes attorneys, financial analysts, etc., as well as Tom Smith, founder of Partners in Leadership, author of The Oz Principle, and primary financier of Millcreek Commercial's real estate fund. (If you are not familiar with Tom, please look him up, and you will get an idea of the caliber of ethical business standards and practices that go into everything Millcreek does. There are reasons we don't bend, coerce, lie, and fight dirty like so many of our competitors out there.)

None of the substantive claims about the Millcreek investments were true and each named Defendant knew they were not true.

24.     Defendant Colliers International ("Colliers") is an international real estate, valuation, consulting and investment services company that was at all relevant times registered to do business in the State of Utah.

25.     Colliers maintains four offices in Utah.  Colliers' acts that are the subject of this lawsuit were performed in close association with Millcreek Commercial Properties, LLC and directed towards transactions having a nexus in Utah.

26.     Defendant Kevin G. Long ("Long") is an individual residing in Utah.  Long is the architect of the Millcreek fraud along with Brent Smith.

27.     Long was the founder and principal of Millcreek.

28.     At all relevant times, Long was an employee and agent of Millcreek.  Millcreek marketed for Millrock who received fraudulently-obtained funds from investors siphoned through Millcreek and other entities.  Long was a principal and owner of Millrock.

29.     Long was the Principal Broker and COO of CBC Advisors, a real estate professional services and investment company acquired by Colliers in 2017.

30.     After Colliers' acquisition of CBC Advisors, Long worked as an agent and broker for Colliers.

31.     Long founded Millcreek and affiliated commercial real-estate investment funds, including Millrock Investment Fund 1.

32.     Long is "President of Millcreek with Colliers."

33.     Defendant Equity Summit Group P.C. ("Equity Summit") is a Utah professional corporation with its principal place of business in Pleasant Grove, Utah.

34.     Defendant Brent Smith ("Smith") is an individual residing in Utah.

35.     Defendant Andrew Bell ("Bell") is an individual residing in Utah.

7

36.     At all material times, Bell was an employee and agent of Millcreek.

37.     At all material times, Bell was an employee and agent of Colliers.

38.     Defendant Scott Rutherford ("Rutherford") is an individual residing in Utah.

39.     At all material times, Rutherford was an agent and representative of Millcreek, Equity Summit, and Elevated.  At all times, Rutherford was an agent and representative of Colliers.

40.     Defendant Mark Machlis ("Machlis") is an individual residing in Salt Lake County, Utah.

41.     Machlis worked as an undisclosed agent of Colliers receiving kickbacks and fees for the investors he sold to or referred.

42.    Machlis is the registered agent and principal broker of Green Ivy Realty.



43.    Machlis is a development partner of Millrock Investment Fund 1, LLC. (See the
address Machlis listed for himself in Arizona Case 2:24-bk-00631 Document 1 page 24). This
relationship was never disclosed to any investor although it was material to the purchases each
investor made.



44.    On information and belief, Machlis worked as an agent for Millcreek Commercial in connection with the sale of each of the Millcreek properties purchased by Plaintiffs in this matter.



**Intro**

We specialize in assisting buyers all along Utah's Wasatch Front to find the perfect home, vacation retreat, or investment property. Our website contains ALL listings from ALL Real Estate Agents in the State of Utah.
www.greenivyrealty.com

**Page** · Real Estate Agent

Salt Lake City, UT, United States, Utah

(801) 860-7658

markmachlis.valuedagent.com

greenivyrealty.com

⭐ Not yet rated (1 Review) ⓘ

**Green Ivy Realty**
July 7, 2020 · 🌐

Building Wealth Through Investment Real Estate

Thursday July 9, 2020 11:00 am MT

Mark Machlis, principal broker at Green Ivy Realty will be explaining his 30 40 50 Strategy. This is an investment strategy based around how to build a residential real estate portfolio in your 30's, how to manage that portfolio through your 40's, and when to transition to passive cash flow for retirement years in your 50's. Millcreek Commercial fits perfectly into the later stages of the 30 40 50 Strategy to provide exceptional income and tax saving opportunities. This free webinar will be packed with the steps Mark took to build and manage his portfolio and transition into passive retirement income. Of course, it is never too late to start this strategy, and for some of us, retirement looks pretty busy!

Interested? Click Here to join us this Thursday. Can't make the webinar? Sign up anyway and a replay will be available after recording. If you feel that forwarding this email would be helpful to your friends or clients, feel free to invite them.

https://us02web.zoom.us/.../501.../WN_tPFr3i8BQ3ivB1j92gV4vg

45.    Defendant Green Ivy Realty, Inc ("Green Ivy") is a Utah corporation.

46.    At all material times, Long, Rutherford, Bell, Machlis and Smith acted as close business associates of one another, including through joint marketing, communications, social media, and transactional commission payments.

47.    At all material times, Millcreek and Colliers acted in concert planning the joint marketing, internet sales communications, social media, and TIC structure. They jointly profited from the fraudulent scheme through undisclosed kickbacks and "profits."

11

48.    Collectively, Millcreek, Millrock, Colliers, Long, Equity Summit, Smith, Machlis, Bell, Rutherford, and Green Ivy are referred to herein as the "Millcreek/Colliers Parties" or "Defendants."

## JURISDICTION AND VENUE

49.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 of the claims arising under federal law including 15 U.S.C. §78j(b), 15 U.S.C. §78t(a) and 15 U.S.C. §77l.

50.    The Court has supplemental jurisdiction over state law claims asserted pursuant to 28 U.S.C. §1367, because such claims are so related to the claims arising under the laws of the United States that they form part of the same case or controversy under Article III of the United States Constitution.

51.    Venue is appropriate under 28 U.S.C. 1391(b)(2) and 15 U.S.C. 78aa.

52.    In connection with the conduct alleged in this Complaint, Defendants, directly and indirectly, used the means and instruments of interstate commerce, including mail, telephone, and internet communications.

## THE SCHEME

**Millcreek/Colliers TIC Program**

53.    Millcreek Commercial Properties, LLC ("Millcreek") actively markets tenant-in-common ("TIC') interests in commercial real estate as safe and secure investments offering a guaranteed source of long-term income.  Frequently, Millcreek pitched the TIC investments to potential buyers seeking to utilize the tax benefits of an exchange under IRS Section 1031. Purchasers in a 1031 exchange are ideal marks for unscrupulous sellers as they are under strict time constraints when identifying and buying property.

54.    Millcreek was founded and is run by Kevin Long of Colliers International ("Colliers").  Long has acted in partnership with Colliers in marketing and selling TIC securities investments.  Millcreek marketed its properties over the telephone, internet, through mail and using other means of interstate communication almost always under the banner of Colliers.

55.    The Bomben plaintiffs, for example, were marketed TIC investments by Rutherford at Colliers offices in Glendale, California.

56.    Millcreek and Millrock along with their co-conspirators, would purchase commercial properties and then enter into long-term lease agreements at above market rates.  Millcreek would then market the properties to potential investors with long-term leases representing that the leases provided a safe and secure source of passive income.

57.    The lease terms were in fact so extravagant that it was clear to Defendants from the outset that the lease terms could not be met.  To hide the scheme, Defendants would pay rents to the investors from invested money, thereby postponing the collapse of the scheme while Millcreek continued to defraud new investors.

58.    Millcreek stated that investors could "rest assured that our portfolio is rock solid.  We vigorously vet every property that we offer."  They represented that they sold only properties with tenants who can "thrive in any economic environment."  But in fact, the leases were often with shell entities with no real assets.

59.    Millcreek marketed TIC investments in properties at multiple locations, including Naperville, Illinois; Romeoville, Illinois; Pine Bluff, Arkansas; Kennesaw, Georgia; Draper, Utah; Bluffdale, Utah; Keller, Texas; and Crockett, Texas (collectively the "Millcreek Properties").

60.    Millcreek's affiliate, Millrock Investment Fund 1, LLC, ("Millrock") which is also managed and operated by Kevin Long, contracted with developers to make renovations,

improvements, and perform construction on the Millcreek Properties. Kevin Long and Millrock had a close association with these developers who colluded with Long and Millcreek.

61.     The Millcreek/Colliers Parties represented that they had already secured for each of the Millcreek Properties, a paying tenant with sufficient revenue to service their long-term lease. These purported tenants included Surgical Ambulator Regional Center ("SARC"), Advance Care Medical, Inc., and other entities that were related to Healthcare Solutions Holdings Inc. ("HSH").

62.     HSH is a Delaware corporation with its principal place of business in Glen Cove, New York. HSH is a wholly owned subsidiary of Health Care Solutions Management Group, Inc. ("HSMG"). HSH was represented by the Millcreek/Colliers Parties as being a "dream tenant" working with Millcreek. Millcreek and its co-conspirators represented that HSH was a financially sound company focused on providing clinicians with "state of the art diagnostic and therapeutic tools." Millcreek represented that HSH "will capture revenue and margins that have historically been lost [capturing] significantly enhanced operating margins." But in fact, HSH was a shell company without any substantive operations or assets.

63.     HSMG was forced into involuntary bankruptcy in September of 2023, Delaware Bankruptcy Court, Case No. 1:23-bk-11458.

64.     Joshua Constantin ("Constantin"), the Head of Commercial Real Estate for HSH, was "indefinitely barred by the United States Securities and Exchange Commission from acting as a broker or investment advisor, or from associating with any broker, dealer, investment advisor, municipal securities dealer, municipal advisor, or transfer agent" in Case No. 1:11-cv-04642 in the United States District Court for the Southern District of New York.

65.     Thus, from at least 2013, Defendants knew or should have known that Constantin had violated federal securities laws and was barred from participating in the sale of securities.

66.    The Millcreek/Colliers Parties represented that rent payments were backed by two guarantees protecting investors from potential losses.  The first was a corporate guarantee backing the lease. The corporate guarantor for HSH was HSMG.

67.    The second was represented by Millcreek to be a bond issued by Lloyd's of London, the world's leading insurance/reinsurance market, when in reality they were not bonded by Lloyd's of London – a name that was meant to inspire confidence from investors in the protection of the amounts invested.

68.    To locate potential investors and induce their investments, Millcreek and its agents relied on a network of referring parties, including real estate agents, financial planners, attorneys, qualified intermediaries, and 1031 exchange agents, to locate and refer potential investors to them. The referral parties included Mark Machlis who steered investors to Millcreek in exchange for commissions or kickback fees of up to 6%.

**The Millcreek/Colliers Parties Jointly Target Retirement Investors**

69.    Long was the Senior Vice President of the Utah division of Colliers, as shown in this email signature from communications with Plaintiff below:

Kevin G. Long

Senior Vice President
Direct +1 801 947-8324 | Mobile +1 801 400-2080
Main +1 801 610-1300 | Fax +1 801 947-8301
kevin.long@colliers.com

Colliers International – Utah | Millcreek Commercial
2100 Pleasant Grove Blvd | Suite 200
Pleasant Grove, UT 84062 | United States

www.millcreekcommercial.com
www.colliers.com

 

70.     From 2013 to 2016, Long was the Principal Broker and COO of CBC Advisors, a

real estate company:

**Kevin G. Long**

Executive Vice President
Direct +1 801 947-8324 | Mobile +1 801 400-2080
Main +1 801 610-1300 | Fax +1 801 947-8301
kevin.long@colliers.com

**Colliers International – Utah | Millcreek Commercial**
2100 Pleasant Grove Blvd | Suite 200
Pleasant Grove, UT 84062 | United States

www.millcreekcommercial.com
www.colliers.com

 

71.     In 2017, Long founded Millcreek, and affiliated commercial real estate funds,

including Millrock Investment Fund 1 of Utah ("Millrock").

72.     Long was "President of Millcreek with Colliers," as shown in this excerpt from his

personal LinkedIn page:

**Kevin Long**
President, CEO and Co-Founder of Millcreek Commercial

## Experience

**President of Millcreek Commercial with Colliers International | Utah**
Millcreek Commercial
Jun 2017 - Present · 6 yrs 1 mo
Salt Lake City, UT

73.     Long represented that Millcreek and Colliers worked in partnership with each

other, as shown in this excerpt from the Millcreek/Colliers website:

 

In his previous position, Scott was the Executive Vice President of Sales and Marketing for the largest provider of Real Estate partial ownership projects in the United States. Through his efforts, he developed an impeccable reputation and a nationwide client base. The alliance between the Rutherfords and Millcreek Commercial will enable Millcreek to become the preeminent provider of tenant-in-common real estate in the US. Millcreek Commercial utilizes Colliers International as their brokerage partner and Old Republic Title to ensure the chain of title on every transaction. These two global partners provide Millcreek Commercial with an unsurpassed national platform.

74.     At all material times, Long, Rutherford, Machlis, Smith, and other agents of Millcreek and Colliers were close business associates, including through joint marketing, communications, social media, and transactional commission payments.

75.     In 2017, Millcreek Commercial and its agents under Long's leadership, began marketing and selling TIC interests in the Millcreek Properties through Colliers.

76.     Long, Rutherford, Bell, and Smith are not registered with FINRA (the Financial Industry Regulatory Authority) to sell securities.

77.     The TIC interests sold by Millcreek/Colliers Parties in the Millcreek Properties were not registered as securities by filing a registration statement, nor were they exempt under the 1933 Securities Act.

78.     The Millcreek/Colliers Parties marketed TIC interests to potential buyers who wished to take advantage of the IRS Section 1031 exchange program.

79.     A 1031 exchange permits those who sell business or investment property to postpone paying tax on the gain if the funds are reinvested in a "like-kind exchange"- i.e., property of the same nature or character as the sold property.

80.     1031 exchanges must take place over a constrained time frame by law.

81.     The new property must be purchased within 180 days from the date the original property is sold.

82.     The tax-deferral advantages of a 1031 exchange appeal to retirees, particularly when such an exchange promises large monthly returns on which they could rely during their final years.

83.     Millcreek marketed that "Millcreek Commercial generates passive income for you."

84.    The Millcreek/Colliers Parties typically bundled long-term, triple net leases with the sale of TIC interests; these triple net leases were likely more closely related to absolute net leases rather than an actual triple net lease.

85.    Each named Defendant, including Long, Machlis and Smith represented to Plaintiffs that the triple net lease made the investment entirely "passive" with no need for the investor to have any management responsibility. The success of the investment was entirely dependent upon the actions of the tenant and Millcreek or Millcreek administration and management.

86.    Rutherford, Long and the Millcreek/Colliers Parties represented that the owners of the TIC interests would not be responsible for any management fees or other expenses related to the property and the tenant.  However, the owners have had to pay a 2% management fee for the upkeep of the property that the tenant should have paid.

87.    Millcreek/Colliers Parties putatively offered TIC interests only in properties that already had guaranteed leases in place with operating tenants.  Long, Machlis and Smith made these representations to Plaintiffs in 2021 and 2022 and in each instance they knew the representations were false.

88.    The lease connected with each TIC property was sold as a safe income stream for the Millcreek/Colliers Parties' targeted investors.

89.    Millcreek marketed their properties to "leave the headaches of being a landlord behind."

90.    Millcreek also coaxed possible investors by saying, "[r]est assured that our portfolio is rock solid. We rigorously vet every property that we offer", as shown in this excerpt from Millcreek's website, on a page called "1031 Exchange".  Machlis, Long, Rutherford, Smith

and Bell each made this false representation to Plaintiffs during the sales period from the end of 2021 to mid-2022.

## Exchanging Hassle For Happiness.

Tenant issues, fixing toilets, and painting walls is hard work. Have you ever considered owning quality commercial real estate? With our passive lease structure, you can leave the headaches of being a landlord behind. We deliver fully managed properties with better returns than your current real estate investment, giving you more time to do the things you love. Our co-ownership model makes it possible for any investor to utilize and 1031 exchange to buy into high quality commercial real estate. Rest assured that our portfolio is rock solid. We rigorously vet every property that we offer.

**The Millcreek/Colliers TIC Program Sales Pitch**

91.     Plaintiffs were told that "[i]n terms of commercial real estate, a 'bad investment' could equal a property that goes under, an unreliable tenant, or a property that requires extensive responsibility on the part of the investor. Millcreek brings experience to the table by identifying and purchasing profitable properties that will benefit the portfolios of investors," as shown in this excerpt from Millcreek's website:

### Choosing a bad investment

Another fear in the commercial real estate investment world may include choosing a bad investment. In terms of commercial real estate, a "bad investment" could equal a property that goes under, an unreliable tenant, or a property that requires extensive responsibility on part of the investor. Millcreek Commercial brings experience to the table by identifying and purchasing profitable properties that will benefit the portfolios of investors. One key way that Millcreek Commercial avoids a "bad investment" from the beginning is through purchasing properties with "recession resilience", or in other words, properties that have tenants who thrive in any economic environment.  The types of properties included in Millcreek Commercial's portfolio include pharmacies, convenience stores, and medical centers.

92.     Plaintiffs were told that with every property, investors could "enjoy a quality property that has been identified and vetted by seasoned professionals", as stated in this excerpt from the Millcreek website:

> After identifying the property, Millcreek will ensure that the property meets three of four requirements: single tenant, long-term lease, investment grade, and triple-net leased. In addition, Millcreek Commercial will travel to the property for a personalized inspection of the property, building, and the surrounding area. Millcreek Commercial's years of experience in identifying profitable properties allows investors to avoid having to fear getting stuck with a "bad investment". Their expertise can help investors enjoy a quality property that has been identified and vetted by seasoned professionals.

93.    The leases represented by the lease agreement appeared more closely related to an absolute net lease, which includes capital improvements to the property with everything included in a triple net lease.

94.    Millcreek stated that "Millcreek Commercial ensures that any commercial property has a corporate guarantee to protect investors. Investors with Millcreek Commercial properties can rest assured that they will not lose money, rather benefit from a steady stream of passive income," as shown in this excerpt from an article from Millcreek Commercial titled "Investing Isn't Scary":

> Millcreek Commercial ensures that any commercial property has a corporate guarantee to protect investors. Investors with Millcreek Commercial properties can rest assured that they will not lose money, rather benefit from a steady stream of passive income.

95.    Accordingly, the Millcreek/Colliers Parties stated the lease was "backed by strength" by HSMG, the guarantor on the lease and a member of the HSH Parties.

96.    Millcreek represented that HSMG working "in cooperation' with Millcreek" was developing a nationwide network of surgery centers.

97.    The Millcreek/Colliers Parties represented that the prestigious Lloyd's of London insurance entity insured the lease.

20

98.    The Millcreek/Colliers Parties told Plaintiffs that they could rest assured that the investment would be "safe, stable, [and] secure," as shown in this excerpt from marketing materials provided by Millcreek:

**Invest with Us**
At Millcreek Commercial, we take the benefits of investing in commercial real estate to the next level. Our "all-gain, no-pain model" produces monthly passive income, requires zero heavy-lifting, and tax-protects our co-owners.

Invest with us today and access premium commercial real estate that is a safe, secure, and stable place to put your hard-earned dollars to work.

99.    The Millcreek/Colliers Parties represented that "every Millcreek Commercial transaction is treated with the same care and attention to detail that would occur in a typical $10 million commercial investment real estate transaction", as per this excerpt from Millcreek's Frequently Asked Questions page on their website:

## How is a purchase executed?

Every Millcreek Commercial transaction is treated with the same care and attention to detail that would occur in a typical $10 million commercial investment real estate transaction. After you have reviewed the Offering

100.    Millcreek Commercial stated that "[o]ur acquisition team only purchases properties that our principals want to hold in our portfolios," as shown in this excerpt from an article on Millcreek's website titled "7 Reasons to Consider Millcreek Commercial":

**4. Philosophy and Core Values**

Our acquisition team only purchases properties that our principals want to hold in our portfolios. We purchase these properties debt free and then invite others to join us as Tenant In Common owners. Every property must pass the relative test – we would sell this to our mother, grandmother, best friend or son.

101.    Millcreek stated that "we typically stay in our deals for the long term […] This commitment provides our partners with the added assurance that we believe in and are committed

to our products", as shown in this excerpt from an article on Millcreek's website titled "7 Reasons to Consider Millcreek Commercial":

**5. Long Term Partners**

Millcreek Commercial typically stays in our deals for the long term. There are situations where we could sell all of a syndication, but our business model is for one of our partners or family member to stay in a deal for the long term. This commitment provides our partners added assurance that we believe in and are committed to our products.

102.    The Millcreek/Colliers Parties represented that they had done many such deals before.

103.    The Millcreek/Colliers Parties told Plaintiffs that Millcreek "utilizes Colliers International as [its] brokerage partner."

104.    The Millcreek/Colliers Parties represented to the Plaintiffs that the Millcreek/Colliers partnership extended internationally because Colliers was Millcreek's "global partner", as shown in this excerpt from an article on Millcreek's website titled "7 Reasons to Consider Millcreek Commercial":

**2. A National Platform**

Millcreek Commercial utilizes Colliers International as their brokerage partner and Old Republic Title to ensure the chain of title on every transaction. These two global partners along with Kevin's expansive network, provide Millcreek Commercial with an unsurpassed national platform.

105.    The Millcreek/Colliers TIC Program's representatives communicated with Plaintiffs using their official Colliers email addresses.  In addition, Defendants Long, Machlis, Taylor and others, spoke directly with investors repeating the misrepresentations contained in the offering materials.

106.    Colliers' logo was prominently placed right next to Millcreek's logo on the pages of the properties it listed.

107.    Colliers' logo was also prominently displayed on emails and marketing materials used by Long and other Millcreek Commercial agents.

108.    For instance, below is the front page of the Millcreek/Colliers' parties Offering Memorandum for TIC investments in the Naperville Property:



109.    Below is the heading of the second page of the Offering Memorandum for the Naperville Property, again prominently featuring the logos of both Millcreek and its partner, Colliers:



## MILLCREEK COMMERCIAL | Colliers

**Advance Care Medical | Naperville, IL**

### Property Information

| | |
|---|---|
| Tenant | Advance Care Medical |
| Location | 2975 Showplace Dr., Naperville, IL 60564 |
| Property Type | Freestanding, Medical |
| Building Size | 3,500 Square Feet |
| Purchase Price | $5,078,231.42 |
| Cap Rate | 6.00% |

Advance Care's mission and business strategy is to provide better, more consistent, comprehensive care solutions by vertically integrating urgent care facilities with ancillary services and new technologies. The intended outcome is to provide a broader continuum of patient care at a lower cost and generate significantly higher operating margins.

### Naperville, IL

Naperville Crossings is situated at the Northwest Corner of Route 59 and 95th Street in the heart of South Naperville's retail corridor. Lot sits as an outparcel to AMC Showplace 16 which boasts over 750,000 visitors per year. Tapestry of Naperville, a 300-unit residential project, is adjacent to center. There is ample parking available and multiple points of access via Route 59 or 95th Street.

### About Tenant In Common

Tenant in common or TIC ownership allows two or more people to hold an ownership interest in a property. Each property owner or business entity holds its own separate stake in the property and receives a deed. Their interests do not have to be equal.

This Millcreek Commercial property has the following characteristics:

· Property is offered debt-free
· Long-term, corporate-guaranteed lease
· Satisfies IRS requirements for 1031 exchanges

Office | 801.899.1943
www.**MILLCREEKCOMMERCIAL**.com

### Lease Information

| | |
|---|---|
| Lease Guarantor | Healthcare Solutions Holdings Inc |
| Initial Lease Term | 20 years |
| Rent Increases | 2% increases every year |
| Renewal Options | Two 5-year options |
| 20 Yr. Avg. Return | 7.25% |

| Year | Gross Rent | Net Rent | Cap Rate |
|---|---|---|---|
| 2021 | $323,866.85 | $ 317,389.46 | 6.00% |
| 2022 | $330,344.19 | $ 323,737.25 | 6.12% |
| 2023 | $336,951.07 | $ 330,212.00 | 6.24% |
| 2024 | $343,690.09 | $ 336,816.24 | 6.36% |
| 2025 | $350,563.89 | $ 343,552.56 | 6.48% |
| 2026 | $357,575.17 | $ 350,423.61 | 6.6% |
| 2027 | $364,726.68 | $ 357,432.09 | 6.73% |
| 2028 | $372,021.21 | $ 364,580.73 | 6.86% |
| 2029 | $379,461.63 | $ 371,872.34 | 6.99% |
| 2030 | $387,050.87 | $ 379,309.79 | 7.13% |
| 2031 | $394,791.88 | $ 386,895.99 | 7.27% |
| 2032 | $402,687.72 | $ 394,633.91 | 7.42% |
| 2033 | $410,741.48 | $ 402,526.58 | 7.57% |
| 2034 | $418,956.30 | $ 410,577.12 | 7.72% |
| 2035 | $427,335.43 | $ 418,788.66 | 7.87% |
| 2036 | $435,882.14 | $ 427,164.43 | 8.02% |
| 2037 | $444,599.78 | $ 435,707.72 | 8.18% |
| 2038 | $453,491.78 | $ 444,421.87 | 8.34% |
| 2039 | $462,561.61 | $ 453,310.31 | 8.51% |
| 2040 | $471,812.85 | $ 462,376.52 | 8.68% |

Millcreek Commercial | 2100 S Pleasant Grove Blvd. Ste 200, Pleasant Grove, UT

110.    On the front page of the Offering Memorandum, Millcreek, and Colliers further state:

> The Tenant in Common (TIC) interests sold by Millcreek Commercial Properties constitute interests in real property. They do not constitute securities. Consequently, federal and state laws regulating the sale of securities do not apply with respect to the sale of TIC interests, and purchases of TIC interests will not be entitled to the protection afforded to purchasers of securities under federal and state securities laws. Nothing in the attached offering documents should be construed as an offer or a solicitation of an offer to buy or sell securities.

24

111.    This was the same for all of the Millcreek Properties that are the subject of this suit.

## BACKGROUND OF DEFENDANTS' PREVIOUS SCHEMES, FRAUDS, AND INVESTIGATIONS

112.    A nearly identical fraudulent scheme was operated by Rockwell, LLC.  Rockwell sold TIC interests bundled with inflated long-term leases.  The Ponzi scheme was sustained by paying investors "rents" with investor money.  That scheme is detailed in Case No. 2:19-cv-277 in the United States District Court for the District of Utah and in Case No. 2:20-cv-00004 in the United States District Court for the District of Utah among other cases.

113.    The Rockwell conspirators entered a consent decree with the Securities and Exchange Commission on December 30, 2020. Case No. 2:20-cv-918, Dkt. 7.

114.    At least by 2018, Millcreek/Colliers Parties knew or should have known that defendant Scott L. Rutherford was a participant in the nearly identical Rockwell Ponzi scheme.

115.    On July 26, 2023, the DOJ filed an indictment against the Rockwell Ponzi scheme conspirators including Scott L. Rutherford alleging wire fraud conspiracy.  The Rockwell criminal case is set for trial on July 28, 2025.

116.    On information and belief, Rutherford left the Rockwell Ponzi scheme when it collapsed in 2019 and began working with the Millcreek Ponzi scheme.

## MISREPRESENTATIONS AND OMISSIONS

**Misrepresentations and Omissions to All Plaintiffs**

117.    Long, Rutherford, Bell, Smith, and Machlis made multiple representations to Plaintiffs, including by way of offering memoranda, property descriptions on Millcreek's website, and during discussions with the Plaintiffs.

118. Thes Millcreek/Collier's representatives, and in particular Long, Rutherford, Smith and Machlis specifically represented to each Plaintiff that Millcreek and its principals had performed thorough due diligence on each tenant for each Millcreek property sold as a TIC investment. This representation was false, as each Defendant, including Long, Smith and Machlis, knew that each tenant was without financial substance and could never satisfy its obligations under the so-called guaranteed long-term leases.

119. The Millcreek/Collier's representatives represented to each Plaintiff with respect to the Millcreek Properties located in Keller, Texas, Draper, Utah, Pine Bluff, Arkansas, Napierville, Illinois, Crockett, Texas and Lehi, Utah that investors were purchasing fully functioning surgery centers, with financially sound tenants, indeed the "tenants of their dreams." Smith, Long, Machlis and Rutherford knew that the representations were false when made.

## ADDITIONAL MISREPRESENTATIONS AND OMISSIONS

120. Machlis represented to John Bosshard, and other Plaintiffs in 2021 and 2022, that he had done full due diligence on the Keller property and its putative tenants. He stated that the tenant was an operating entity, that the facility was fully completed and that rents were currently being paid by the tenant. These representations were false.

121. Machlis and Long represented to John Bosshard and other Plaintiffs that the lease rate at Keller was "market" and fair. In fact, Machlis and Long knew that the lease rate was up to three times the market rate and was artificially inflated by Millcreek, i.e., Long, Smith, and Rutherford, to support a fraudulent sales price.

122. While working as a real estate agent for John Bosshard in 2021, Machlis omitted that he was at the same time working for Millrock and Millcreek.

123.    On October 19th of 2021 Mark Machlis emailed John Bosshard and stated that "HSH started to pay rent" for the Keller facility.  This was a lie.  HSH never paid rent for the Keller facility.



124.    Machlis made these claims as a Green Ivy Realty Broker using his Green Ivy Realty email.  Machlis was also secretly operating as an undisclosed paid agent for Colliers.

125.    On information and belief Machlis comingled funds with Green Ivy Realty and failed to respect corporate formalities.  Green Ivy Realty is an alter ego of Machlis.

126.    At an in-person meeting at Top Golf in the Fall of 2022, Long told Plaintiff Craig Marsden that, with regard to the Keller TIC, Long had done the most thorough due diligence vetting tenants.  Long and Smith represented that Millcreek sold only triple-net properties of the highest quality with tenants known to be safe and financially stable.  Long and Smith represented that only the highest-quality reliable tenants would be accepted for a Millcreek property.  Long

and Smith represented that such a tenant was on site at the Keller property and that the property was "ready to go". These statements were false.

127. At the same meeting Long told Marsden that, regarding the Keller property, all income made from the TIC interest would be completely passive. The purchase was turn-key and no management or other involvement was expected or required.

128. Long, Rutherford and Smith told all Plaintiffs on numerous occasions, but especially from the end of 2021 through mid-2022 that each Millcreek tenant was financially strong. Long, Smith and Machlis knew that the tenants had little or no ability to pay rents, had failed to pay rent in the past, and that the "rent" that did go out to investors was actually paid out of investor funds.

129. HSH never paid rent in Draper or Keller. Long, Rutherford, Smith and Machlis lied to Plaintiffs about this.

130. Long, Smith and other agents of Millcreek and Millrock, misrepresented that Keller had or was about to get a certificate of occupancy.

131. Millcreek and the Defendants secretly lent money to HSH to try to keep the Ponzi scheme afloat longer so they could dupe more investors. This information was intentionally withheld from the Plaintiffs. Long, Smith and Rutherford deliberately withheld this information knowing it would be material to investors.

132. Long used the names Millcreek and Millrock interchangeably. Management and funds were intermingled. Both entities were the alter egos of the Defendants.

133. All Defendants participated in, or had knowledge of, the dissemination of the marketing materials which contained the numerous misrepresentations and omissions described above. At all times, Defendants were acting as agents of Colliers.

134.    Andrew Bell and other Defendants represented that SARC by HSH was the tenant for Keller.  This was false.  Indeed, on information and belief there is no legal entity with this name.

135.    Brent Smith, Andrew Bell and other Defendants represented that the Draper tenant was SARC by HSH – Draper, Utah Inc.  This was false there is no such entity.

136.    Andrew Bell and other Defendants represented that Millcreek would not close on investment transactions until "rents are being generated."  This was a lie.

137.    Andrew Bell, Kevin Long and other Defendants represented that rents were being withheld in Draper because of a "signage dispute."  This was false.

138.    The marketing materials stated that HSH was a publicly traded company.  Long repeated this lie on September 1, 2020.  This statement was false at material times, and omitted the fact that HSH eventually became "public' through a reverse merger with a defunct shell entity.

139.    Brent Smith and other Defendants represented that ADP-Millcreek 1, LLC was a "quality national developer" and that Sequoia Development had "an impeccable record and is highly regarded in the Utah development and construction community."  These representations were false when made.

140.    Defendants represented that the Keller tenant had paid in full all contractors, laborers, and materialmen for work performed, services rendered, or materials furnished in connection with the Landlord's Work obligations under the lease.  This was false.

141.    Kevin Long, Brent Smith and other Defendants represented that there was a fixed price contract to complete improvements at Draper and Keller which "guarantees seller's performance."  These representations were false.

142.    Kevin Long and Scott Rutherford distributed to Plaintiffs, what, on information and belief, is a fake lease showing that the Keller property was rented by Justin Smith.

143.    Long and Rutherford represented to Plaintiff Groetsch, that Keller and Bluffdale had solid financially sound tenants that were "revolutionizing healthcare." Long further represented that Keller was close to move-in ready.

144.    Long, Rutherford and other Defendants represented falsely that rents were being paid in Draper and Keller.

145.    Long and Rutherford intentionally omitted information about inflated commissions, referral fees and fees paid to Millcreek/Colliers agents.

146.    All Defendants knew and intentionally withheld the fact that the so-called "dream tenants" failed to pay rents as early as the first part of 2021. Long represented to Plaintiffs and specifically Defendants Groetsch and Freeze, that Millcreek had performed exhaustive due diligence and that all Millcreek tenants were "the best of the best" and that there were never any issues. These representations were knowingly false.

## FIRST CAUSE OF ACTION
### (Violations of Section 10(b) of the Securities Exchange Act and Rule 10b-5 – Against All Defendants)

147.    By this reference, Plaintiffs incorporate all other allegations in this Complaint.

148.    Investment in the Millcreek Properties, coupled with guaranteed leases, was a security as defined in 15 U.S. Code § 77b (a)(1) in that it involved investment in a common enterprise with the success of the venture dependent primarily upon the efforts of others.

149.    Defendants made untrue statements of material fact and omitted material facts necessary to make the statements not misleading, as alleged above, in violation of Rule 10b-5.

150.    The material misrepresentations and omissions were made in connection with the offer to sell a security.

151.    Such material misrepresentations and omissions include, in addition to those previously alleged and incorporated herein:

      a.    That the Millcreek/Collier Parties had conducted due diligence on the tenants for the Millcreek Properties;

      b.    The risk analysis of the Millcreek Properties;

      c.    The average capitalization rate over the lease term;

      d.    That the tenants for the Millcreek Properties were "dream tenants;"

      e.    That the guarantor was a solvent company;

      f.    That the properties were backed by a Lloyd's of London bond in place, in case of tenant and guarantor default; and

      g.    That Millcreek's TIC offerings did not constitute securities, and federal and state laws regulating the sale of securities did not apply.

152.    Defendants all made the material misrepresentations and omissions either through verbal or written correspondence with Plaintiffs or through their marketing materials.

153.    Defendants' material misrepresentation and omissions were made through the means or instruments of communication in interstate commerce or the mails— including telephone lines, the internet, email transmissions over the internet, and the United States Postal Service.

154.    Defendants acted knowingly in making material misrepresentations and omissions or should have known but acted with reckless disregard for their truth.

155.    Plaintiffs justifiably relied on the foregoing misrepresentations and omissions.

156.    Plaintiffs' suffered substantial injury as a result of Defendants' misrepresentations and omissions in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
### (Control Person Liability Under the Securities Exchange Act Against Long, Smith, Bell, and Rutherford)

157.    By this reference Plaintiffs incorporate all other allegations in this Complaint.

158.    Millcreek Commercial and Colliers International, named as Defendants in Plaintiffs' First and Second Causes of Action, are liable under Chapter 2B of Title 15 of the United States Code, the Securities Exchanges Act of 1934, and are referred to in this Cause of Action as the "Liable Persons."

159.    At all times relevant to this Complaint, the Defendants identified in this Third Cause of Action (Long, Taylor, Smith, Bell, and Rutherford) controlled the Liable Persons, as follows:

   a.  Defendants were officers, directors, agents, or other control people of entities that are Liable Persons;

   b.  Defendants had authority over the Liable Persons as employers, supervisors, or persons with the ability to affect the terms of the Liable Person's employment or livelihood;

   c.  Defendants exercised actual control over the Liable Persons through authority, economic influence, contractual rights, or the use of dominant bargaining power or position;

   d.  Liable Persons willingly submitted to and complied with the instruction, direction, or authority of Defendants; and

e.  Defendants participated in the business operations of the Liable Persons generally.

160.  Defendants had power over the specific transactions and activities at issue in this Complaint.

161.  With respect to their conduct and control of the Liable Persons relating to the matters addressed in the First Cause of Action, Defendants did not act in good faith, and the acts of Defendants did directly or indirectly induce the acts of the Liable Persons.

162.  Pursuant to Section 20(a) of the Securities Exchange Act (15 U.S.C. § 78t (a)), Defendants are jointly and severally liable with and to the same extent as the Liable Persons, and Plaintiffs are therefore entitled to a Judgment against Defendants awarding damages in an amount to be proven at trial, but which is the equivalent of any award determined under any other applicable cause of action.

## THIRD CAUSE OF ACTION
### (State Law Securities Fraud - Against All Defendants)

163.  By this reference, Plaintiffs incorporate all other allegations in this Complaint.

164.  The Plaintiffs' investment in the Millcreek Properties that are the subject of this Complaint is within the securities definition under applicable state law provisions.

165.  Under applicable provisions of state securities laws, Defendants were required to fully and fairly disclose all material facts that a reasonable investor would consider important in making investment decisions.  In connection with the Defendants' sale and the Plaintiffs' purchase of investments in the Millcreek Properties, Defendants made untrue statements of material fact; omitted to state material facts necessary to make the statements made, considering the circumstances under which they were made, not misleading; or otherwise engaged in conduct that worked fraud or deceit upon the Plaintiffs in violation of applicable provisions of state law.

166.    The Defendants violated the applicable laws knowing they failed to make a full and fair disclosure to the Plaintiffs and with negligence and reckless indifference to what they knew or should have known.

167.    Plaintiffs did not know that Defendants' misrepresentations were false and were unaware of the material facts that Defendants omitted to disclose concerning their purchase of securities.

168.    By reason of Defendants' violations of applicable state statutes governing securities fraud, Plaintiffs are entitled to a judgment awarding the applicable statutory remedies, which may be measured by the total amount of Plaintiffs' investment plus interest at applicable rates, less the value of what Plaintiffs received from the investment, together with all other applicable relief provided by law.

169.    Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorney's fees as provided in the applicable statutes, and such further relief as the Court may deem appropriate under the circumstances.

**FOURTH CAUSE OF ACTION**
**(State Law Securities Violation/Sale by Unlicensed Broker**
**or Investment Adviser - Against All Defendants)**

170.    By this reference, Plaintiffs incorporate all other allegations in this Complaint.

171.    The investments in the Millcreek Properties that are the subject of this Complaint are within the definition of securities under applicable provisions of state law.

172.    Defendants functioned as securities agents in selling the investment in Millcreek Properties to the Plaintiffs.

173.    Defendants' conduct violates provisions of applicable state law which requires securities agents to be licensed.

174.    By reason of Defendants' unlicensed participation in the sale of securities to the Plaintiffs, Plaintiffs are entitled to a judgment awarding the applicable statutory remedies, which may be measured by the total amount of Plaintiffs' investment plus interest at applicable rates, less the value of what Plaintiff received from the investment, together with all other applicable relief provided by law.

175.    Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees as provided in the applicable statutes, and such further relief as the Court may deem appropriate under the circumstances.

### FIFTH CAUSE OF ACTION
**(Materially Aiding State-Law Securities Fraud - Against Long, Smith, Bell, and Rutherford)**

176.    By this reference, Plaintiffs incorporate all other allegations in this Complaint.

177.    The Defendants identified in the Plaintiffs' Fourth and Fifth Causes of Action are liable to Plaintiffs under the applicable state statutes described above and are referred to in this Cause of Action as the "Liable Persons."

178.    At all times relevant to this Complaint, the Defendants identified in this Cause of Action materially aided the Liable Persons in violating the applicable state securities laws by conduct including but not limited to the following:

179.    Defendants were officers, directors, agents, or other control people of Liable Persons' entities and authorized, ratified, endorsed, or participated in the conduct constituting the violation.

180.    As part of their employment or business or commercial activity and in exchange for payment or other compensation, Defendants provided information, services, labor, or funds

that significantly advanced the Liable Persons' unlawful conduct or purposes with respect to Plaintiff.

181.    Defendants otherwise engaged in conduct materially aiding the Liable Persons in accomplishing the unlawful sale of securities to Plaintiffs.

182.    Defendants did not act in good faith, and Defendants knew or recklessly disregarded the facts in carrying out their conduct relating to the sale of securities to Defendants.

183.    Pursuant to applicable state law relating to those who materially aid securities violations, Defendants are jointly and severally liable with and to the same extent as the Liable Persons, and Plaintiffs are therefore entitled to a judgment against Defendants awarding damages in an amount to be proven at trial, but which is the equivalent of any award determined under Plaintiffs' Fourth and Fifth Causes of Action, together with all other applicable relief provided by law.

184.    Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorney's fees under contract or at law, and such further relief as the Court may deem appropriate under the circumstances.

## SIXTH CAUSE OF ACTION
### (Common Law Fraud - Against All Defendants)

185.    By this reference, Plaintiffs incorporate all other allegations in this Complaint.

186.    Defendants made false statements about vital facts regarding the Millcreek Properties, including the representations within the marketing materials and the representations made to each of the named Plaintiffs that (1) due diligence was performed on the tenants for the properties; (2) that the rents would be paid by the tenants even where, in the instance of the property in Keller, Texas, the tenant was not yet occupying the space; and (3) that the tenants agreed to pay rent.

187.    Defendants made the statements knowing that they were false.  Defendants, including Mary Street, knew that the tenants were sham companies and that the tenants did not have the ability to pay rent.  Therefore, to conceal this from Plaintiffs, Defendants caused a combination of Millrock, Millcreek, and Advanced American Development Partners to pay rents at the various properties – with investors' money.

188.    Millcreek omitted to disclose to the Plaintiffs that the tenant Healthcare Solutions Holdings ("HSH") was late to pay rent as early as December 2021, and instead covered the rents for the tenant.

189.    Alternatively, Defendants made the statements recklessly and without regard for their truth.

190.    Defendants intended that Plaintiffs would rely on the statements and Plaintiffs did, in fact, rely on the false statements and omissions in entering into transactions to purchase TIC shares in the Millcreek Properties.

191.    Plaintiffs reasonably relied on the statements by investing in the TIC shares in the Millcreek Properties.

192.    As a result of Defendants' conduct, Plaintiffs have suffered damages in an amount to be proven at trial.

193.    Because Defendants' conduct was intentional, knowing, reckless, and malicious, and in disregard of Plaintiffs' rights, Plaintiffs are entitled to punitive or exemplary damages in an amount to be determined by the trier of fact.

## SEVENTH CAUSE OF ACTION
### (Negligent Misrepresentation - Against All Defendants)

194.    By this reference, Plaintiffs incorporate all other allegations in this Complaint.

195.    Defendants had a duty to determine and disclose fully and fairly all facts that materially affected or related to the condition of the Millcreek Properties, the viability of the investment, and the legitimacy of the tenant and corporate guarantor.

196.    Defendants made false representations to Plaintiffs as detailed above.

197.    Defendants owed a duty of reasonable care to Plaintiffs independent of any contractual obligation.

198.    Defendants knew such representations were false or were negligent in making such representations.

199.    Defendants were negligent in investigating the tenant and the corporate guarantor.

200.    Defendants knew or should have known the misrepresentations were false.

201.    The Defendants made the misrepresentations to induce Plaintiffs into purchasing the shares of the Millcreek Properties for a grossly inflated price.

202.    The foregoing misrepresentations and omissions were not only material, but the information was critical to Plaintiffs' evaluation of whether to purchase the TIC shares of the Millcreek Properties.

203.    Plaintiffs would not have invested in the Millcreek Properties had they known the true facts.

204.    Plaintiffs justifiably relied on the foregoing misrepresentations.

205.    As a result of Defendants' negligence, Plaintiffs have been damaged in an amount to be proven at trial.

## EIGHTH CAUSE OF ACTION
### (Breach of Fiduciary Duty - Against All Defendants)

206.    By this reference, Plaintiffs incorporate all other allegations in this Complaint.

38

207.    Defendants had or held themselves out as having superior skill, knowledge, training, and experience concerning all aspects of the transactions by which Plaintiffs invested in the TIC shares of the Millcreek Properties.

208.    Defendants expected that Plaintiffs would put trust and confidence in Defendants and affirmatively invited and encouraged Plaintiffs to rely on their judgment and skill regarding their TIC investments in the Millcreek Properties.

209.    The TIC investment structure and IRS rules made Plaintiffs the weaker party, with unique vulnerabilities, including, inter alia, Plaintiffs' ages, experience, abilities, and disabilities.

210.    The Plaintiffs' unique vulnerabilities put them in an unequal bargaining position with Defendants.

211.    Defendants owed Plaintiffs fiduciary duties of honesty, loyalty, care, and a duty to use their special skills for Plaintiffs' benefit.

212.    Plaintiffs reposed absolute trust and confidence in Defendants to advise, counsel, and protect Plaintiffs.

213.    Defendants accepted trust and confidence from Plaintiffs.

214.    Plaintiffs depended on Defendants to do their due diligence into the legitimacy of the tenant and guarantor.

215.    Defendants also had access to superior and exclusive knowledge about the Millcreek Properties investment opportunity, such as information about the financial performance of the tenants, including HSH and their affiliate entities, and the flow of funds to and from those entities.

216.    Defendants breached their fiduciary duties to Plaintiffs by, inter alia, failing to investigate the legitimacy of the tenant and guarantor or concealing their knowledge regarding the same and by making the materially false or misleading representations or omissions alleged above.

217.    Defendants' breach of fiduciary duties directly and proximately caused injury and damages to Plaintiffs.

218.    As a result of the Defendants' conduct, the Plaintiffs have been damaged in an amount to be proven at trial.

219.    Because Defendants' conduct was intentional, knowing, reckless, and malicious, and in disregard of Plaintiffs' rights, Plaintiffs are entitled to punitive or exemplary damages in an amount to be determined by the trier of fact.

## NINTH CAUSE OF ACTION
### (Unjust Enrichment of Defendants – Against All Defendants)

220.    By this reference, Plaintiffs incorporate all other allegations in this Complaint.

221.    Plaintiffs conferred a benefit on the Defendants by making investments in the Millcreek Properties, including having Mary Street serve as the property manager.

222.    Defendants each received a benefit from Plaintiffs in the form of commissions or other compensation paid from the proceeds of the sale transaction; access to and direct use of the identifiable proceeds of the investment; and perpetuation of the overall scheme.

223.    Defendants knowingly benefitted from the proceeds of the Millcreek Properties' transactions and diverted invested money to purposes not benefiting Plaintiffs.

224.    Under the circumstances, equity and justice demand that Defendants not be permitted to retain the benefits conferred upon them by Plaintiffs without compensating Plaintiffs.

225.    By reason of Defendants' unjust enrichment, Plaintiffs are entitled to a judgment awarding an amount to be determined at trial, but which may be measured by the total amount of

benefit that Plaintiffs have conferred upon Defendants, together with all other applicable relief at law or in equity, including but not limited to a constructive trust requiring to hold funds for Plaintiff's benefit and return them as ordered by the Court.

226.    Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorney's fees under contract or by law, and such further relief as the Court may deem appropriate under the circumstances.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs request relief as follows:

A.    An award of actual damage and punitive or exemplary damages, attorney's fees, and costs in an amount to be proven at trial, plus any applicable interest.

B.    Pre-judgment interest, attorney fees, and costs of suit to the extent allowed by applicable law.

C.    If for any reason the 1031 exchanges are deemed to be invalid, for all taxes, interest, fines, and fees caused by Defendants' malfeasance.

D.    Such other relief as may be just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all claims so triable in this case.

DATED: March 21, 2025.                    NELSON CHRISTENSEN
                                          HOLLINGWORTH & WILLIAMS


                                          */s/ Wesley Felix*
                                          *Attorney for Plaintiffs*