IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ROGER WILSON, an individual; RAYMOND BOMBEN, an individual; OWENA BOMBEN, an individual; JOSH BOSSHARD, an individual; SOPHANA CHEA, an individual; SHERMAN FREEZE, an individual; SANDRA FREEZE, an individual; CASSANDRA FREEZE, an individual; LUCY A. GROETSCH, an individual; ROBERT MICHAEL SAYERS, an individual; WILFRED SINDON, an individual; and CRAIG MARSDEN, an individual<br><br>    Plaintiffs,<br><br>v.<br><br>MILLCREEK COMMERCIAL PROPERTIES, LLC, a Utah limited liability company; MILLROCK INVESTMENT FUND 1, LLC, a Utah limited liability company; COLLIERS INTERNATIONAL, a business operating in Utah under a dba; EQUITY SUMMIT GROUP P.C., a Utah corporation; BRENT SMITH, an individual; KEVIN G. LONG, an individual; SPENCER TAYLOR, an individual; ANDREW BELL, an individual; SCOTT RUTHERFORD, an individual; MARK MACHLIS, an individual; GREEN IVY REALTY, INC., a Utah corporation; and DOES 1-10, individuals or entities,<br><br>    Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS**<br><br>No. 2:24-cv-00624-TC-CMR<br><br>Judge Tena Campbell<br><br>Magistrate Judge Cecilia M. Romero |

This fraud case, brought under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, arises out of an investment by twelve Plaintiffs: Roger Wilson; Raymond Bomben;

Owena Bomben; John Bosshard; Sophana Chea; Robert Michael Sayers; Sherman Freeze; Sandra Freeze; Cassandra Freeze; Lucy A. Groetsch; Wilfred Sindon; and Craig Marsden. The Plaintiffs allege that the following Defendants orchestrated a commercial real estate Ponzi scheme: Millcreek Commercial Properties, LLC (Millcreek); Millrock Investment Fund 1 LLC (Millrock); Colliers International (Colliers); Equity Summit Group P.C. (Equity Summit Group); Brent Smith; Kevin G. Long; Andrew Bell; Scott Rutherford; Mark Machlis; and Green Ivy Realty, Inc. (Green Ivy Realty).

This matter comes before the court on two motions to dismiss brought under Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure by Defendants Green Ivy Realty, Mark Machlis, Millrock, and Brent Smith (collectively, the Moving Defendants). The first motion to dismiss was filed by Green Ivy Realty and Mr. Machlis (ECF No. 105), and the second motion was filed by Millrock and Mr. Smith. (ECF No. 109.) Although not identical, the two motions raise many similar arguments, and so are addressed together. For the reasons stated below, the Moving Defendants' motions to dismiss are granted in part and denied in part.

## BACKGROUND[1]

The Defendants are in the business of marketing and selling Tenant-in-Common (TIC) investments in commercial real estate. (Second Am. Compl. (SAC), ECF No. 100 at ¶ 53.) A TIC investment is one in which multiple investors hold a stake in real property. Each TIC investor owns a share of a property with no right of survivorship, meaning that if one investor dies, his share of the property goes to his heirs, and not the surviving tenant(s). (Id. ¶ 109.) As this court has recognized, "[s]uch investments are considered attractive because they can provide

---

[1] The court accepts the SAC's allegations as true for the purposes of this order. See Albers v. Bd. of Cty. Comm'rs of Jefferson Cty., 771 F.3d 697, 700 (10th Cir. 2014).

a steady return-on-investment through rental income and because they allow investors to receive certain federal tax benefits." <u>DiTucci v. Ashby</u>, No. 2:19-CV-277-TC-PMW, 2020 WL 1249627, at *1 (D. Utah Mar. 16, 2020).

The Plaintiffs' claims relate to their purchase of TIC shares in eight of Millcreek's properties across Naperville, Illinois; Romeoville, Illinois; Pine Bluff, Arkansas; Kennesaw, Georgia; Draper, Utah; Bluffdale, Utah; Keller, Texas; and Crockett, Texas (collectively, the Millcreek Properties). (SAC ¶¶ 1, 4.) From 2017 to 2022, the Defendants marketed the Millcreek Properties to the Plaintiffs, several of whom were targeted because they were planning to conduct tax-advantageous exchanges under Internal Revenue Code (IRC) § 1031. (<u>Id.</u> ¶¶ 53, 75, 78, 79.) Section 1031 of the IRC allows investors who have sold one investment property to postpone paying taxes on the proceeds of their sale so long as they can identify a replacement property within 45 days, close the transaction within 180 days, and transfer all their proceeds into the new property. (<u>Id.</u> ¶¶ 53, 79–82, 90.) These types of 1031 exchanges appeal to retirees, among other types of investors, because they can live on the monthly rental income distributions until the property is sold, hopefully at a profit, at some point in the future. (<u>Id.</u> ¶ 82.)

The alleged scheme worked as follows: Millcreek, a now defunct marketing entity without assets and operations, together with Millrock,[2] purchased eight low-value commercial properties. (<u>Id.</u> ¶¶ 22, 28, 56.) Millrock and Millcreek then entered into long-term lease agreements with "sham tenants" for above-market rents, which artificially boosted the properties' valuations. (<u>Id.</u> ¶¶ 1, 22, 56, 187.) Millcreek and Millrock, their founders—Mr. Long and Mr. Smith—and their real estate agents at Colliers and Green Ivy Realty—including Mr. Bell, Mr.

---

[2] As discussed below, the Plaintiffs allege that Millcreek and Millrock were alter ego entities, with comingled assets, management, and founders. (<u>See</u> SAC ¶¶ 60, 132.)

3

Rutherford, and Mr. Machlis—would then market TIC shares of the properties based on these artificially inflated valuations, representing that the properties were supported by vetted, corporate-guaranteed, long-term leases. (Id. ¶¶ 66, 95, 97, 151.)

Several of the Defendants told the Plaintiffs that, in exchange for their long-term investment, the Plaintiffs would receive regular returns paid out of the tenants' rent, totaling 6–9% of the Plaintiffs' investment, in addition to a payout some years later if the properties sold at a profit. (Id. ¶¶ 5, 101.) The Defendants characterized the Plaintiffs' potential returns as "passive income" because the Plaintiffs would not have any management responsibilities or obligation to pay regular dues or management fees. (Id. ¶¶ 83, 85–86.)

The Defendants also advertised the investment as "safe" and "rock solid" based on the Defendants' due diligence on the Millcreek Properties' tenants and the tenants' guarantors—in other words, the Defendants claimed that their tenants could and therefore would pay the marketed rents. (Id. ¶¶ 7, 56, 90, 92–95.) In support of these claims, the Defendants assured the Plaintiffs that the Millcreek Property tenants, including HealthCare Solutions Holdings, Inc. (HSH), the Surgical Ambulator Regional Center (SARC), and Advance Care, Medical, Inc., were "reputable" companies. (Id. ¶¶ 5, 61–62.) They described HSH as their "dream tenant" because it was a public company from which rent was guaranteed: first by a corporate guarantee from its parent company, Health Care Solutions Management Group, Inc. (HSMG), and second, by a bond issued by Lloyd's of London, a leading insurance and reinsurance provider. (Id. ¶¶ 3, 62, 67, 96, 119.) Millcreek also claimed that it was working in "cooperation" with HSMG to build a nationwide network of surgical centers. (Id. ¶ 96.) These representations were communicated to the Plaintiffs through emails from the Millcreek, Green Ivy Realty, and Colliers representatives, in conversations and pitch presentations between Mr. Long, Mr. Machlis, Mr. Smith, Mr.

Rutherford, Mr. Bell, and the Plaintiffs, and through posts on Millcreek's website.  (E.g., id. ¶¶ 90–105.)

All the while, the Defendants knew that the Millcreek Property tenants, including HSH, were effectively shell entities with no substantive assets or ability to pay rent.  (Id. ¶¶ 1, 3, 58, 62.)  The Defendants knew but concealed that HSH's parent company and guarantor, HSMG, was on its way to insolvency and was run by someone who had already been convicted of securities fraud and lost his trading license.  (Id. ¶¶ 62–65.)  The Defendants were also aware that HSH never actually paid rent for its leases in Draper or Keller—indeed, the Millcreek Property in Keller never had a certificate of occupancy.  (Id. ¶¶ 129, 140.)  Further, HSH was not at that time a publicly traded company.  (Id. ¶ 138.)

While the Plaintiffs collectively invested $10,789,965.17 in the Millcreek Properties thinking they would own TIC shares, the Defendants instead used these investor funds to pay the contracted "rent" on the tenants' behalf—in other words, the funds were not invested, they were instead spent paying "distributions" to the Plaintiffs and kickbacks to the Defendants.  (Id. ¶¶ 2, 8, 129, 131, 187–88.)

The scheme involved at least ten Defendants, both individuals and entities.  (Id. ¶¶ 8, 24–48, 68.)  Mr. Long—the founder, president, and principal of the Millcreek and Millrock entities and a broker for Colliers—was one of the two lead orchestrators of the scheme, along with Mr. Smith.  (Id. ¶¶ 26–32.)  Mr. Long founded and ran Millcreek and Millrock in partnership with and under the banner of Colliers, where he was a broker and agent.  (Id. ¶¶ 30, 54, 72–75.)

Colliers is an international real estate and investment services company that served as one of the "brokerage partner[s]" for the Millcreek Properties.  (Id. ¶¶ 73, 103–04.)  Several Colliers brokers marketed the deal to the Plaintiffs, meaning that Colliers and its brokers profited from

the scheme.  (Id. ¶¶ 24–25, 47.)  Colliers' logo was frequently displayed on the emails and marketing materials that Mr. Long and other Millcreek and Millrock agents sent to the Plaintiffs. (Id. ¶¶ 107–10.)

Mr. Long made numerous misrepresentations to the Plaintiffs guaranteeing that their investments would be safe.[3]  At an in-person meeting at a Salt Lake City driving range in the fall of 2022, Mr. Long, along with Mr. Smith, assured Craig Marsden, a prospective investor, that Mr. Long had done thorough due diligence vetting tenants of the Keller property.  (Id. ¶ 126.) But Mr. Long and Mr. Smith knew that these tenants were unable to pay the marketed rent.  (Id.) At the same meeting, Mr. Long and Mr. Smith said that investor income would be completely passive and that investors would not be required to pay management fees.  (Id.)  But Millcreek eventually charged the Plaintiffs a 2% "management fee."  (Id. ¶ 145.)  And on a separate occasion, Mr. Long, along with Mr. Rutherford, showed the Plaintiffs a falsified lease with a fake tenant.  (Id. ¶ 142.)

Millcreek and Millrock are affiliated companies jointly managed by Mr. Long and Mr. Smith.  (Id. ¶¶ 22, 60, 132.)  The two entities played slightly different but complementary roles in the scheme.  Millrock provided capital for the purchase of the TIC properties and contracted with developers and contractors to make renovations, improvements, and perform construction work on the Millcreek properties.  (Id. ¶¶ 6, 22, 56, 60.)  Then Millcreek marketed the investment opportunity on its website, through social media, investor decks, presentations, and the outside brokers it hired.  (Id. ¶ 59.)  Millcreek's website advertised that the company "vigorously vet[s] every property" and that its investors could "rest assured that our portfolio is

---

[3] While Mr. Long, Mr. Rutherford, Mr. Bell, Colliers, and Equity Summit have not moved to dismiss the Plaintiffs' claims against them, the court provides background on their involvement for context.

rock solid." (Id. ¶¶ 58, 90.)[4]  Millcreek's website further promised that the investment properties met at least "three of four requirements: single tenant, long-term lease, investment grade, and triple-net leased." (Id. ¶ 92.)

The Plaintiffs allege that the bulk of the investor funds flowed from Millcreek to Millrock.  Millrock then paid Mr. Smith, Mr. Long, and the brokers representing Millcreek and Millrock. (Id. ¶¶ 22, 28.)  The Plaintiffs also allege that the two companies' funds were intermingled, and that the companies paid each business's debts and expenses. (Id. ¶ 132.)  Mr. Long used the names Millcreek and Millrock interchangeably when discussing the Millcreek Properties investment with the Plaintiffs. (Id.)

Mr. Smith helped found and run Millrock as a principal, along with Mr. Long. (E.g., id. ¶¶ 22, 26–28, 31–32, 54, 71–72, 118, 130, 159.)   During the sales and marketing period from 2021 to 2022, Mr. Smith represented to the Plaintiffs that they would be investing in properties with corporate-guaranteed leases and operating tenants in place. (Id. ¶¶ 1, 3, 66, 87, 94–95, 118.) At a Fall 2022 investor meeting at a Salt Lake City driving range, Mr. Smith told Mr. Marsden that: 1) Millcreek sold only triple-net properties of the highest quality with tenants known to be safe and financially stable; 2) only the highest-quality reliable tenants would be accepted for a Millcreek property; and 3) a high-quality tenant was already on-site and "ready to go" at the Keller property. (Id. ¶ 126.)  This was the same meeting where Mr. Long, Mr. Smith's partner, told Mr. Marsden that Millcreek had done thorough due diligence on tenants of the Keller TIC and that any investment would be "completely passive" with no management fees. (Id. ¶¶ 86, 118, 126–27.)  Mr. Smith also misrepresented that Millrock had a fixed price contract with

---

[4] It is not clear which Defendants had access and posted to Millcreek's website.

Sequoia Development to complete improvements at the Draper and Keller properties which "guarantee[d] seller's performance." (Id. ¶¶ 139–41.)

To locate potential investors and persuade them to invest, Mr. Long, Mr. Smith, Millcreek, and Millrock relied on a network of referring parties in and outside of Colliers, including "real estate agents, financial planners, attorneys, qualified intermediaries, and 1031 exchange agents." (Id. ¶ 68.) This network included Mark Machlis, the principal broker and founder of Green Ivy Realty,[5] who acted as a referring party for Colliers and a real estate agent for Millcreek. As Millcreek's real estate agent, Mr. Machlis and Green Ivy Realty, working with Mr. Long and Mr. Smith, marketed and sold to the Plaintiffs the TIC interests in the Millcreek Properties.

In 2021 and 2022, Mr. Machlis sent emails from his Green Ivy Realty email account to Josh Bosshard, a client of his, marketing the Millcreek Properties as an opportunity "we could do" for a 1031 exchange investment. (Id. ¶ 123.) Mr. Bosshard believed that Mr. Machlis was acting as his real estate agent on this investment. (Id.; see also Min. Entry, ECF No. 120.)[6] Mr. Machlis told Mr. Bosshard and other Plaintiffs that 1) he had done full due diligence on the Keller Property and its tenant; 2) HSH had already started to pay rent there; 3) the Keller Property was priced at the fair market price; and 4) the Keller Property renovations had already been completed. (Id. ¶¶ 120, 121, 123.) But Mr. Machlis knew that 1) the rent was up to three times the market rate, artificially inflated to support a fraudulent investor valuation; and 2) that

---

[5] The Plaintiffs allege that Mr. Machlis comingled funds with Green Ivy Realty and failed to respect corporate formalities. (SAC ¶ 125.)

[6] At the July 1, 2025 hearing, Mr. Machlis and Green Ivy Realty conceded that they represented Mr. Bosshard on numerous real estate deals, but argued that the closing documents in this transaction, which the court has not been shown, indicate that Mr. Machlis represented Millcreek. (ECF No. 120.)

HSH never paid any rent for the Keller property.  (Id.)  Mr. Machlis did not tell Mr. Bosshard that he was acting as the seller's agent for Millrock and Millcreek and would therefore be compensated by Millcreek with up to 6% of Mr. Bosshard's investment, nor did he seek Mr. Bosshard's consent to this arrangement before accepting commission payments from Millcreek. (Id. ¶¶ 41–44, 68, 122.)

Scott Rutherford, an agent at Colliers in Glendale, California, and Equity Summit in Utah, marketed the TIC investments to the Bombens in 2021.  (Id. ¶ 55.)  Mr. Rutherford told the Bombens that the tenants of the Millcreek Properties were financially sound and had been thoroughly vetted by Mr. Long and other Millcreek professionals.  (Id. ¶ 6.)  Mr. Rutherford also described the Millcreek Properties as "turn key" investments, meaning that investors would receive an "immediate ROI in the form of rents."  (Id.)  He said "that each of the properties sold by Millcreek were ready to support the operations of an active long-term tenant and that the investment would be completely passive featuring triple-net leases and no investor maintenance or management responsibility."  (Id.)  Each of these representations was false.

Mr. Bell was another agent at Colliers who worked as a broker for Millcreek, advertising the investment to several Plaintiffs in exchange for commissions or kickbacks from Millcreek. (Id. ¶¶ 7, 36–37, 117, 134–37.)  Mr. Bell told the Plaintiffs that 1) the Draper property would be leased by SARC; 2) Millcreek did not close on investment properties until "rents were being generated;" and 3) rents were being withheld on the Draper property because of a contrived signage dispute.  (Id.)  Each of these statements was false.

The Plaintiffs' SAC contains nine causes of action.  The first claim, against all Defendants, is for violation of Section 10(b) of the Securities Exchange Act of 1933 and its implementing regulation, Rule 10b-5.  (Id. ¶¶ 147–56.)  The second claim, against Mr. Long, Mr.

Smith, Mr. Bell, and Mr. Rutherford, is for control person liability under the Securities Exchange

Act, alleging that these individuals were in control of Millcreek and Colliers in the companies'

commission of fraud.  (Id. ¶¶ 157–62.)  The third claim, against all Defendants, is for securities

fraud in violation of the Utah Uniform Securities Act, Utah Code Ann. § 61-1-1 to -206 and other

unidentified states' laws regulating securities fraud.  (Id. ¶¶ 163–69.)  The fourth claim, against

all Defendants, is for violation of the Utah Uniform Securities Act and other applicable but

unidentified state laws governing the sale of securities by an unlicensed broker or investment

advisor.  (Id. ¶¶ 170–75.)  The fifth claim, against Mr. Long, Mr. Smith, Mr. Bell, and Mr.

Rutherford, is for materially aiding securities fraud in violation of the Utah Uniform Securities

Act and other unidentified states' laws.  (Id. ¶¶ 176–84.)  The sixth claim, against all Defendants,

is for common law fraud.  (Id. ¶¶ 185–93.)  The seventh claim, against all Defendants, is for

negligent misrepresentation.  (Id. ¶¶ 194–205.)  The eighth claim, against all Defendants, is for

breach of fiduciary duty.  (Id. ¶¶ 206–19.)  The ninth claim, against all Defendants, is for unjust

enrichment.  (Id. ¶¶ 220–26.)

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a complaint "must plead facts sufficient to

state a claim to relief that is plausible on its face."  Slater v. A.G. Edwards & Sons, Inc., 719 F.3d

1190, 1196 (10th Cir. 2013) (internal punctuation omitted) (citing Ashcroft v. Iqbal, 556 U.S.

662, 678 (2009)).  A claim is facially plausible when the allegations in support contain factual

content that allows the court to draw a reasonable inference that the defendants are liable for the

misconduct alleged.  See Burnett v. Mortg. Elec. Registration Sys., Inc., 706 F.3d 1231, 1235

(10th Cir. 2013).  The court must accept all well-pled allegations in the complaint as true and

construe them in the light most favorable to the plaintiffs.  See Albers v. Bd. of Cty. Comm'rs of

Jefferson Cty., 771 F.3d 697, 700 (10th Cir. 2014).  "Threadbare recitals of the elements of a

cause of action, supported by mere conclusory statements, do not count as well-pleaded facts."

Warnick v. Cooley, 895 F.3d 746, 751 (10th Cir. 2018).  The court's function is "not to weigh

potential evidence that the parties might present at trial, but to assess whether the plaintiff's

complaint alone is legally sufficient to state a claim for which relief may be granted."  Sutton v.

Utah Sch. for the Deaf & Blind, 173 F.3d 1226, 1236 (10th Cir. 1999) (quoting Miller v. Glanz,

948 F.2d 1562, 1565 (10th Cir. 1991)).

## ANALYSIS

### I.    Pleading Standards For Federal Law Fraud Claims

The Moving Defendants argue that the SAC fails to allege fraud with the level of

particularity required under Rule 9(b) of the Federal Rules of Civil Procedure and the Private

Securities Litigation Reform Act of 1995 (PSLRA).

Section 10(b) the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and the Securities

and Exchange Commission's Rule 10b–5, 17 C.F.R. § 240.10b–5, prohibit fraudulent acts

performed in connection with securities transactions.  Section 10(b) makes it unlawful "[t]o use

or employ, in connection with the purchase or sale of any security ... any manipulative or

deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may

prescribe as necessary or appropriate in the public interest or for the protection of investors."  15

U.S.C. § 78j(b).  Rule 10b–5 makes it unlawful to make "any untrue statement of a material fact

or to omit to state a material fact necessary in order to make the statements made, in the light of

the circumstances under which they were made, not misleading ...."  17 C.F.R. § 240.10b–5.

To state a claim under Rule 10b-5 for securities fraud, the Tenth Circuit requires five

elements: 1) the defendant made an untrue or misleading statement of material fact, or failed to

state a material fact necessary to make statements not misleading; 2) the statement complained of was made in connection with the purchase or sale of securities; 3) the defendant acted with scienter, that is, with intent to defraud or recklessness; 4) the plaintiff relied on the misleading statements; and 5) the plaintiff suffered damages as a result of his reliance. See Grossman v. Novell, Inc., 120 F.3d 1112, 1118 (10th Cir. 1997).

Before the passage of the PSLRA, Rule 9(b) of the Federal Rules of Civil Procedure set the standard for the level of "particularity" or detail required when pleading the four elements of a securities fraud claim. See City of Philadelphia v. Fleming Cos., Inc., 264 F.3d 1245, 1258 (10th Cir. 2001). Rule 9(b) dictates that in alleging fraud "the circumstances constituting fraud" must be "state[d] with particularity," while "[m]alice, intent, knowledge and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). To satisfy Rule 9(b)'s heightened pleading standard, a pleading must "set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof." Combs v. SafeMoon, LLC, Case No. 2:22-cv-642-DBB-JCB, 2024 WL 1347409, at *4 (D. Utah Mar. 29, 2024) (citing Schwartz v. Celestial Seasonings, Inc., 124 F.3d 1246, 1252 (10th Cir. 1997)).

In 1995, Congress further heightened the pleading standards for federal securities fraud claims with the passage of the PSLRA. See Private Securities Litigation Reform Act of 1995, Pub. L. No. 104–67, 109 Stat. 737. The purpose of the PSLRA was to curb perceived abuses in the prosecution of private securities fraud lawsuits, "particularly the filing of strike suits." Fleming Cos., 264 F.3d at 1258 (internal quotation marks omitted). The PSLRA therefore required further detail for two of the elements of a fraud claim, as detailed below. See 15 U.S.C. § 78u–4(b)(1), (2).

First, the PSLRA increased a plaintiff's burden to show that a defendant 1) made a false or misleading statement; or 2) failed to state a material fact necessary to make his statements not misleading.  The PSLRA therefore requires that:

> [T]he complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u–4(b)(1).

Second, the PSLRA heightened the standard for pleading that the defendant acted with "scienter," requiring that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u–4(b)(2); Fleming Cos., 264 F.3d at 1255 n.13; see also Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1094–96 (10th Cir. 2003).

With these pleading standards in mind, the court considers whether the Plaintiffs' Section 10(b) fraud claims against the Moving Defendants are sufficient under the PSLRA and Rule 9(b) of the Federal Rules of Civil Procedure.

### A.    Mr. Machlis and Green Ivy Realty's Involvement

Mr. Machlis and Green Ivy Realty argue that the SAC fails to adequately specify their role in the fraud and the specific misrepresentations they made in furtherance of the scheme. (ECF No. 105 at 6–8.)  This argument is based primarily on Mr. Machlis and Green Ivy Realty's assertion that the SAC improperly relies on "group pleadings"—misrepresentations made by all the individual defendants, or misrepresentations made in the marketing materials published by Millcreek—rather than statements made by Mr. Machlis and Green Ivy Realty.  (Id.)  While the SAC does undoubtedly include some generalized pleadings, the court rejects this argument because it finds that the SAC also refers to specific misrepresentations that Mr. Machlis made to

Mr. Bosshard, therefore adequately detailing "who, what, when, and where" as required under both Rule 9(b) of the Federal Rules of Civil Procedure and the PSLRA.

As an initial matter, the court finds that the Plaintiffs adequately allege that Mr. Bosshard reasonably believed that Mr. Machlis and Green Ivy Realty were acting as his real estate agents on this transaction, as Mr. Machlis and Green Ivy Realty had in the past for numerous prior transactions.  (SAC ¶¶ 120, 122, 124; ECF No. 120.)  Mr. Machlis sold Mr. Bosshard shares of the TIC Properties and used his Green Ivy Realty email to market the scheme, failing to mention his deal with Millcreek.  And the emails between Mr. Machlis and Mr. Bosshard suggest that Mr. Machlis held himself out to represent Mr. Bosshard's financial interests, and not Millcreek's, by suggesting to Mr. Bosshard that "we" could pursue the TIC properties as an option for a 1031 exchange.  (Id. ¶ 123.)  To the extent that there are factual disputes about Mr. Machlis's and Green Ivy Realty's agency relationship with Mr. Bosshard or Mr. Bosshard's beliefs about Mr. Machlis's role as his agent, such claims are better addressed in discovery.  Because the SAC plausibly alleges Mr. Bosshard's reasonable belief that Mr. Machlis was acting as his real estate agent on this transaction, the court infers that Mr. Machlis made a material omission by failing to disclose that he was being paid up to 6% commissions by Millcreek.  (SAC ¶¶ 41–44, 68.)

Similarly, the Plaintiffs provide adequate detail about the express misrepresentations that Mr. Machlis (and therefore Green Ivy Realty) allegedly made about the Millcreek Properties.  In 2021 and 2022, Mr. Machlis told John Bosshard that he had done full due diligence on the Keller Millcreek Property and its tenants.  (Id. ¶ 120.)  He similarly represented that the tenant of the Keller property was an operating entity, that the facility was fully completed, and that rents were already being paid.  (Id. ¶¶ 120, 123.)  Mr. Machlis also said that the lease rate at Keller was "market" and fair.  (Id. ¶ 121.)  Each of these representations was false.  The lease rate at the

14

Keller property was allegedly up to three times the market rate, artificially inflated to support a fraudulent sales price. And HSH never paid Millrock or Millcreek any rent for the Keller property. (Id.)

Green Ivy Realty argues that the Plaintiffs' fraud claims against the company must be dismissed because the Plaintiffs fail to explain the entity's specific role, as compared to Mr. Machlis's role. But Mr. Machlis was the founder and principal of Green Ivy Realty. A corporation acts through its employees and agents. Because the Plaintiffs plausibly allege that Mr. Machlis acted as their broker through his employment at Green Ivy Realty, the court finds that the Plaintiffs have also adequately pled that Green Ivy Realty is vicariously liable for Mr. Machlis's alleged involvement. E.g., Adams, 340 F.3d at 1106 ("The scienter of the senior controlling officers of a corporation may be attributed to the corporation itself to establish liability as a primary violator of § 10(b) and Rule 10b–5 when those senior officials were acting within the scope of their apparent authority."); Kerbs v. Fall River Indus., 502 F.2d 731, 741 (10th Cir. 1974) (holding defendant corporation liable for securities fraud because "its president, acting within the scope of his apparent authority as principal officer and agent of the corporation, engaged in conduct which violated provisions of § 10 of the Act and Rule 10b–5"), abrogated on other grounds by Central Bank of Denver v. First Interstate Bank of Denver, 511 U.S. 164, 191 (1994).

The Plaintiffs also sufficiently plead that Mr. Machlis acted with scienter—meaning that when he made the above representations about the Millcreek Properties, he knew or should have known that these statements were false and misleading. The Plaintiffs allege that Mr. Machlis told Mr. Bosshard and other Plaintiffs that "he had done full due diligence on the Keller property;" that the tenant was an operating entity; that construction of the facility was complete;

and that rents were already being paid.  (SAC ¶ 120.)  These statements were capable of being verified—in other words, Mr. Machlis either did this due diligence to confirm that the tenants were operating entities, or he did not.  The construction on the Millcreek Properties was complete, or it was not.  Rents were being paid by tenants, or they were not.  The rents under the leases were market rate, or they were not.  The court can reasonably infer that Mr. Machlis, given his experience in commercial real estate and longstanding relationship with Mr. Bosshard, could have easily discovered the truth about some or all these statements had he in fact engaged in the due diligence he represented that he had performed, meaning that Mr. Machlis either 1) knowingly misrepresented that he had done extensive due diligence; or 2) knew or discovered that some or all his talking points were false.  That is scienter.  And the court's scienter inference is further bolstered by the fact that Millcreek paid Mr. Machlis and Green Ivy Realty to sell TIC shares to the Plaintiffs, meaning that these Defendants had at least some financial incentive to deceive.  See, e.g., Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 325 (2007) (finding that a defendant's personal financial gain is evidence weighing in favor of a scienter inference); DiTucci, 2020 WL 1249627, at *5 (same, finding that defendants' failure to disclose commissions taken from the plaintiffs' investments weighs in favor of scienter).

In sum, the court finds that the Plaintiffs' allegations against Mr. Machlis and Green Ivy Realty meet the heightened pleading standards for fraud.

### B.    Mr. Smith and Millrock's Involvement

Mr. Smith and Millrock similarly argue that the claims against them should be dismissed because any allegations pertaining to their involvement in the scheme are "group pleadings" that fail to detail the time, place, and content of misrepresentations or omissions made.  (See ECF No. 109 at 6–7.)  While a misrepresentation claim cannot be premised on group pleadings alone,

upon consideration of the SAC as a whole and Mr. Smith's role as a principal of Millrock, the court finds that the Plaintiffs have sufficiently pled that both Mr. Smith and Millrock were knowingly involved in making material fraudulent misrepresentations.

The court first addresses the allegations about Mr. Smith's liability under Section 10-b of the Securities Exchange Act of 1934. The Plaintiffs allege that Mr. Smith attended a Fall 2022 golf outing in which he told Mr. Marsden falsehoods about the development of the Millcreek Properties, the amount of due diligence he had performed, and Millcreek's tenants' ability to pay above-market rents. (SAC ¶¶ 126–27.) Mr. Smith also told Mr. Marsden that investors would not be required to pay management fees. And at this same meeting, Mr. Smith failed to correct his partner, Mr. Long's, misrepresentations. (Id. ¶¶ 126–27, 130.) These value statements are material representations about the quality and safety of the investment that Mr. Smith could have verified were true and which would have influenced any reasonable investor's decision. Because the SAC details how and when Mr. Smith made these specific representations and omissions, the court need not address the Plaintiffs' argument that Mr. Smith is also liable for the misrepresentations made on Millrock or Millcreek's websites and social media accounts.

The court also finds that the Plaintiffs have, under a theory of alter ego liability, adequately pled that Millrock made fraudulent misrepresentations based on the statements contained in Millcreek's marketing materials—screenshots of which are included in the SAC. The Plaintiffs support their claim for alter ego liability by alleging that 1) Millcreek and Millrock are mutually owned and managed by Mr. Long; 2) Millcreek was financed by Millrock; 3) Millrock siphoned off corporate funds from Millcreek, leaving Millcreek underfunded; and 4) the two companies were created to commit fraud. On their face, such allegations about the relationship between Millcreek and Millrock echo the Utah Court of Appeals test for alter ego

liability.  See, e.g., Colman v. Colman, 743 P.2d 782, 786 (Utah Ct. App. 1987) (listing eight

factors court should consider when evaluating claims predicated on theory of alter ego liability);

Jones & Trevor Mktg., Inc. v. Lowry, 284 P.3d 630, 637 (Utah 2012) (adopting the Colman

factors as non-exclusive considerations for alter ego liability); Residential Warranty Servs., Inc.

v. Goyo Media, LLC, No. 2:20-cv-898-TC, 2025 WL 958760, at *26 (D. Utah Mar. 31, 2025)

(same, adopting the Colman factors to determine alter ego liability).  And as this court has

consistently held, "[a]lter ego is a highly fact intensive issue and inappropriate to resolve at the

motion to dismiss stage."  Berrios-Bones v. Nexidis, LLC, No. 2:07-cv-193-DAK, 2007 WL

3231549, at *9 (D. Utah Oct. 30, 2007) (denying motion to dismiss alter ego party because "[t]he

complexities of the relationships between the parties preclude a determination as a matter of

law").  For this reason, the court denies Millrock's motion to dismiss the Plaintiffs' Section 10-b

claim against it.  If Millrock is an alter ego of Millcreek, then it is also responsible for the posts

on Millcreek's website misrepresenting the TIC investment.

The Plaintiffs have also demonstrated that both Mr. Smith and Millrock acted with

scienter.  Mr. Smith made (and failed to correct) false representations that were contradicted by

evidence that Mr. Smith either knew or should have known about.  As with Mr. Machlis, the

court can reasonably infer that, had Mr. Smith conducted the level due diligence that he assured

the Plaintiffs had been performed, then he would have discovered the falsity of these claims.

The same is true concerning the representations contained on Millcreek's website and social

media, statements which, as discussed above, may be attributed to Millrock through a theory of

alter ego liability.  The court can reasonably infer that Mr. Smith and Millrock either

misrepresented to the Plaintiffs the scope of their due diligence into the Millcreek Properties and

their tenants or misrepresented the results of this due diligence.  Further, the Plaintiffs have also

adequately alleged that Mr. Smith and Millrock, like Mr. Machlis and Green Ivy Realty, profited from the Plaintiffs' investment, a fact which weighs in favor of the court's inference of scienter. See Tellabs, 551 U.S. at 308; DiTucci, 2020 WL 1249627, at *5.

## II.    Mr. Smith's Liability for Securities Fraud as a Control Person of Millcreek and Colliers

The Plaintiffs' second cause of action against Mr. Smith is for control person liability concerning Millcreek's and Colliers' role in the scheme.  Under 15 U.S.C. § 77o and 15 U.S.C. § 78t(a), "a person who controls a party that commits a violation of the securities laws may be held jointly and severally liable with the primary violator."  Maher v. Durango Metals, Inc., 144 F.3d 1302, 1304–05 (10th Cir. 1998).  "[T]o state a prima facie case for control person liability, the plaintiff must establish (1) a primary violation of the securities laws and (2) 'control' over the primary violator by the alleged controlling person."  Combs v. SafeMoon, LLC, Case No. 2:22-cv-642-DBB-JCB, 2024 WL 1347409, at *23 (D. Utah Mar. 29, 2024).

Mr. Smith challenges the Plaintiffs' pleading by arguing that the Plaintiffs fail to state a claim that Colliers and Millcreek were "primary violators" and that the Plaintiffs have also failed to allege facts sufficient to demonstrate a control relationship between Mr. Smith, Millcreek, and Colliers.  (ECF No. 109 at 9–10.)  Because the Plaintiffs do not sufficiently allege Mr. Smith's control over Millcreek or Colliers, the court will not address whether the Plaintiffs sufficiently allege that Millcreek or Colliers are "primarily violators" of the Securities Exchange Act.  The Plaintiffs have not opposed Mr. Smith's arguments for dismissing this claim.  (E.g., Pls.' Opp'n Smith & Millrock Mot. Dismiss, ECF No. 113.)

While the second element, "[t]he control person determination[,] is a factual question not ordinarily subject to resolution on a motion to dismiss, dismissal is appropriate when … a plaintiff does not plead any facts from which it can reasonably be inferred the defendant was a

control person." <u>Maher</u>, 144 F.3d at 1306 (affirming dismissal of control liability claim because allegation that the defendant held an ownership interest in the company that was the primary violator entity was, on its own, insufficient to plead that he "controlled" the primary violator). To show control, the plaintiff must allege facts sufficient to show that the defendant had the "direct or indirect … power to direct or cause the direction of the management and policies of [the person or company committing fraud] whether through the ownership of voting securities, by contract, or otherwise.'" <u>Combs</u>, 2024 WL 1347409, at *24 (dismissing control liability claim because "the mere allegation that an individual was the founder of a company, developed a product, or launched a product does not by itself plausibly suggest that that individual had the power to direct the management and policies of a company at the relevant time" (citing 17 C.F.R. § 230.405)).

The court dismisses the Plaintiffs' control liability claim against Mr. Smith because it fails to adequately plead that Mr. Smith exercised control over either Colliers or Millcreek.  Like in <u>Maher</u>, 144 F.3d at 1306, the Plaintiffs' claim rests only on an allegation that Mr. Smith was a "principal" or "substantial owner" of Millrock, which they claim is an alter ego of Millcreek. (SAC ¶¶ 22, 159–162 (claiming that Mr. Smith, as an "officer[], director[], agent[], or other control [person] of entities that are Liable Persons[,] … exercised actual control over the Liable Persons through authority, economic influence, contractual rights, or the use of dominant bargaining power or position"); ECF No. 113 at 2.)  The Plaintiffs do not provide any further details about Mr. Smith's involvement in the management or policies at Millcreek or Millrock. Nor are there any facts alleged demonstrating that Mr. Smith controlled the management or policies at Colliers—indeed, unlike several of the other Defendants, Mr. Smith did not have a leadership role at Colliers.

Because the Plaintiffs' allegations that Mr. Smith manages Millcreek and Colliers are conclusory and merely parrot the elements of a control liability claim, they are dismissed.  See Iqbal, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows a court to draw the reasonable inference that the defendant is liable for the misconduct alleged.") (emphasis added).

### III.    State Law Securities Fraud

The Moving Defendants seek to dismiss the Plaintiffs' third, fourth, and fifth causes of action, which all arise under state statutes governing the commission of securities fraud, on two grounds.  First, the Moving Defendants argue that, to the extent these claims arise under the Utah Uniform Securities Act, the claims must be dismissed because TIC shares are expressly excluded from the definition of a "security" under Utah Code Ann. § 61-1-13(1)(ee)(ii)(C)(II).  (See ECF No. 105 at 8–9; Smith & Millrock Reply Mot. Dismiss, ECF No. 114 at 6–7; ECF No. 109 at 10–11; Machlis & Green Ivy Realty Reply Mot. Dismiss, ECF No. 116 at 4–5.)  Second, the Moving Defendants argue that the Plaintiffs cannot bring claims under other states' laws because the SAC does not specify what other state laws these claims arise under.  (Id.)  At the July 1, 2025 hearing, the Plaintiffs 1) admitted that they had failed to specify what other states' laws applied to their claim, and 2) sought leave to amend the SAC accordingly.

The court addresses first whether the Plaintiffs adequately state a claim under the Utah Uniform Securities Act.  The Utah Uniform Securities Act regulates only the sale of "securities," which includes notes, stocks, bonds, investment contracts, commodities contracts, and several other financial instruments.  See Utah Code Ann. § 61-1-13(1)(ee).  Relevant here, the Utah legislature has determined that the Utah Uniform Securities Act does not apply to the sale of certain assets it does not deem a "security," including:

(II) undivided fractionalized long-term estate in real property that consists of 10 or fewer owners; or

(III) an undivided fractionalized long-term estate in real property that consists of more than 10 owners if, when the real property estate is subject to a management agreement: (Aa) the management agreement permits a simple majority of owners of the real property estate to not renew or to terminate the management agreement at the earlier of the end of the management agreement's current term, or 180 days after the day on which the owners give notice of termination to the manager; and (Bb) the management agreement prohibits, directly or indirectly, the lending of the proceeds earned from the real property estate or the use or pledge of its assets to a person or entity affiliated with or under common control of the manager.

Utah Code Ann. § 61-1-13(1)(ee)(ii)(C).

The Plaintiffs contend, without legal support, that because the TIC Properties were bundled with long-term leases, these real estate investments qualify as "investment contracts," a type of security that is covered by the Utah Uniform Securities Act.  (Pls.' Opp'n Machlis & Green Ivy Realty Mot. Dismiss, ECF No. 112 at 6 (citing Utah Code Ann. § 61-1-13(1)(ee)(i)(k)).)  But the Plaintiffs fail to support their argument with any Utah law defining "undivided fractionalized long-term estate in real property" as investment contracts under these circumstances.  To the contrary, commonsense dictates that most TIC investments in real property are coupled with long-term leases.  Were that not the case, then TIC investors would not receive regular income distributions, benefits which are integral to the structure of these types of investments.  See DiTucci, 2020 WL 1249627, at *1.  If the legislature meant to include TIC investments coupled with lease agreements as a type of "investment contract" regulated by the Utah Uniform Securities Act, then the legislature would have done so.  The court therefore dismisses the Plaintiffs claims arising under the Utah Uniform Securities Act based on the Plaintiffs' failure to demonstrate that they purchased "securities" subject to the regulation.

The court next turns to the Plaintiffs' argument that they should be permitted to 1) bring claims under unspecified state laws regulating the sale of securities; or 2) in the alternative,

amend their state law securities fraud claims to clarify which states' laws apply. Put simply, the Plaintiffs maintain that the Defendants' misconduct must have violated some unidentified state laws in whichever states the TIC investment opportunity was offered or whichever states the TIC offers were received by the Plaintiffs. The Plaintiffs explain that some of the Defendants' TIC investment offers were made or accepted in Washington, California, Alaska, and Idaho, among other places. (See ECF No. 112 at 6; ECF No. 113 at 7–8.)

The court rejects the Plaintiffs' request to sustain their state law securities fraud claims because Rule 9(b) requires that the Plaintiffs "indicate the state statutes under which they seek relief." Chrysler Cap. Corp. v. Century Power Corp., 778 F. Supp. 1260, 1270 (S.D.N.Y. 1991); Arroyo v. Wheat, 591 F. Supp. 141, 144 (D. Nev. 1984) (noting that Rule 9(b) requires that the complaint "be specific as to which state statutes purportedly have been violated by a defendant") (citing Wenzoski v. Citicorp, 480 F. Supp. 1056, 1062 (N.D. Cal. 1979)); but see Denny v. Carey, 72 F.R.D. 574, 579 (E.D. Pa. 1976) (plaintiffs sufficiently indicated which securities fraud statutes were violated by specifying in a letter to defendant's counsel). There is no question that the SAC fails to meet this requirement. The Plaintiffs do not specify which Washington, California, Alaska, or Idaho laws they seek to bring state law securities fraud claims under.

The court also rejects the Plaintiffs' request to amend their state law claims. The Plaintiffs have already had three opportunities to identify which states' laws apply. But they have failed to do so. The Plaintiffs' state law securities fraud claims (Claims 3, 4, and 5) are therefore dismissed with prejudice.

## IV.    Common Law Fraud and Negligent Misrepresentation

The Moving Defendants seek dismissal of the Plaintiffs' sixth cause of action for common law fraud and seventh cause of action for negligent misrepresentation for the same

reason they seek dismissal of the Plaintiffs' federal securities law cause of action, arguing that the SAC does not meet the Rule 9(b) pleading standards.  (See ECF No. 105 at 9–10; ECF No. 109 at 11–12.)  Common law fraud and negligent misrepresentation claims are, like federal securities fraud claims, subject to Rule 9(b)'s heightened pleading standards.  See, e.g., Logan v. Bank of Am., N.A., No. 2:12-cv-191-DN, 2012 WL 5874364, at *3 (D. Utah Nov. 20, 2012); Bradford v. Moench, 670 F. Supp. 920, 925 (D. Utah 1987).

Here, the facts underlying the Plaintiffs' securities fraud claim are the same as those supporting their common law fraud and negligent misrepresentation claims.  Because the court finds these facts meet the Rule 9(b) heightened pleading standards for securities fraud, the court similarly finds that the facts alleged meet the Rule 9(b) standards for pleading negligent misrepresentation and common law fraud.  E.g., Bradford v. Moench, 670 F. Supp. 920, 925 (D. Utah 1987) (finding that a complaint that meets the heightened pleading standard for securities fraud also meets the standard for common law fraud); DiTucci, 2020 WL 1249627, at *8–9 (finding that where a plaintiff adequately pled his federal securities claim, a common law fraud claim premised on same misrepresentations and omissions is pled with sufficient specificity).  The court therefore denies dismissal of the Plaintiffs' sixth and seventh causes of action.

### V.    Breach of Fiduciary Duty

The Moving Defendants argue that the Plaintiffs fail to state a claim for breach of fiduciary duty.  Under Utah law, "[b]reach of fiduciary duty claims generally require proof of four elements: the existence of a fiduciary relationship (such as attorney-client, physician-patient, or insurer-insured); breach of the fiduciary duty; causation, both actual and proximate; and damages."  Gables at Sterling Village Homeowners Ass'n, Inc. v. Castlewood-Sterling Village I, LLC, 417 P.3d 95, 109–10 (Utah 2018).  A fiduciary duty carries with it an obligation

to "deal fairly and openly" with those to whom the duty is owed.  Nash v. Craigco, Inc., 585 P.2d 775, 776 (Utah 1978).  "[N]ondisclosure becomes fraudulent only when there is an existing fact or condition ... which the party charged is under a duty to disclose."  Jensen v. IHC Hosps., Inc., 82 P.3d 1076, 1101 (Utah 2003) (emphasis and internal quotation marks omitted).  Whether a fiduciary duty to disclose exists "is a purely legal question," which Utah courts examine through "the structure and dynamics of the relationship between the parties," including their "legal relationships [and] the duties created by [those] relationships."  Yazd v. Woodside Homes Corp., 143 P.3d 283, 286 (Utah 2006) (internal quotation marks omitted).  Absent a fiduciary relationship between two parties, "[a] person who possesses important, even vital, information of interest to another has no legal duty to communicate the information" to the other.  Id. at 287.

At issue here is whether each set of Moving Defendants owed the Plaintiffs a duty to disclose.  First, Mr. Machlis and Green Ivy Realty argue that they had no fiduciary duty to disclose the truth about the transaction to the Plaintiffs because they were marketing the deal as a broker for Millcreek, and were therefore not representing the Plaintiffs.  But as discussed above, Mr. Bosshard plausibly alleges that he was represented by—or, based on their historical brokerage relationship and Mr. Machlis's emails, reasonably believed he was represented by— Mr. Machlis and Green Ivy Realty.  And under Utah law, licensed real estate agents have an affirmative duty to disclose any material information about the seller or the transaction to the buyer they represent.  Utah Admin. Code R. 162-2f-401a(1)(c); see also Hermansen v. Tasulis, 48 P.3d 235, 241 (Utah 2002) (Finding that broker owes "an independent duty to the [buyers] to disclose facts materially affecting the value or the desirability of the property that were known to him").  If Mr. Machlis and Green Ivy Realty knew or should have known, for example, that the Millcreek Properties were overvalued and occupied by "sham tenants," then they were required

to disclose that information to Mr. Bosshard. Because the Plaintiffs have adequately alleged a broker-buyer relationship, the court will not dismiss the Plaintiffs' eighth cause of action against Mr. Machlis and Green Ivy Realty.

By contrast, the SAC fails to show why Mr. Smith and Millrock owed the Plaintiffs a fiduciary duty to disclose material facts about the transaction. The Plaintiffs argue that a fiduciary relationship existed because they trusted Mr. Smith and Millrock's "superior skill, knowledge, training, and experience concerning all aspects of the transaction." (ECF No. 113 at 8 (citing SAC ¶¶ 207–08).) But such allegations are a "formulaic and conclusory allegation[] of … [fiduciary] duty" insufficient to establish that a party has a legal duty to disclose. GeometWatch Corp. v. Hall, No. 114-cv-60-JNP-PMW, 2017 WL 1136946, at *13 (D. Utah Mar. 27, 2017) (finding plaintiff had not established that defendant owed a fiduciary duty based on allegations that "Defendants owed a legal duty to [plaintiff] to communicate and disclose to [plaintiff] material facts, by virtue of their relationship with [plaintiff], the trust and confidence placed in them by [plaintiff], and their superior knowledge of the relevant facts and circumstances"). The court therefore dismisses the Plaintiffs' eighth cause of action against Mr. Smith and Millrock.

## VI.    Unjust Enrichment

"To support a claim for unjust enrichment, a plaintiff must allege facts supporting three elements: '(1) a benefit conferred on one person by another; (2) an appreciation or knowledge by the conferee of the benefit; and (3) the acceptance or retention of the benefit under circumstances as to make it inequitable for the conferee to retain the benefit without payment of its value.'" Hess v. Johnson, 163 P.3d 747, 754 (Utah 2007) (quoting Jeffs v. Stubbs, 970 P.2d 1234, 1248 (Utah 1998)). "The 'critical inquiry is not whether the benefit is conferred directly on the

defendant, but whether the plaintiff can establish that the relationship between his detriment and the defendant's benefit flow[s] from the challenged conduct.'" Johnson v. Blendtec, Inc., 500 F. Supp. 3d 1271, 1292 (D. Utah 2020) (cleaned up) (citing In re Automotive Parts Antitrust Litig., 50 F. Supp. 3d 836, 864 (E.D. Mich. 2014)).

Mr. Machlis and Green Ivy Realty argue that the Plaintiffs' ninth cause of action for unjust enrichment should be dismissed because Mr. Machlis and Green Ivy Realty "earned" their 6% referral fee from Millcreek in exchange for steering the Plaintiffs to invest. (See ECF No. 105 at 12–13.) But Utah law prohibits real estate agents from accepting consideration from anyone other than their client without disclosing it to all parties and obtaining their client's informed consent. See Utah Admin. Code R. 61-2f-401(2). And as discussed above, the Plaintiffs plausibly allege that Mr. Machlis and Green Ivy Realty acted as their agent in this TIC investment transaction but did not disclose receiving fees from Millcreek. Further, accepting as true the well-pled allegations that Mr. Machlis and Green Ivy Realty knew or should have known that the investment was a Ponzi scheme, then it is unjust for the Defendants to keep commissions from Millcreek.

The Plaintiffs also adequately plead that Mr. Smith and Millrock unjustly benefitted from the scheme. The Plaintiffs believed they were investing in shares of real estate, when, in reality, Mr. Smith, Millrock, and others pocketed some or all of the Plaintiffs' funds and management fees. (E.g., SAC ¶¶ 8, 22, 57.) The Plaintiffs need not, at this stage, detail how exactly the stolen funds were distributed to each Defendant, a fact-intensive inquiry which will require discovery in the Defendants' possession. At this juncture, from the allegations regarding the relationship between Mr. Smith, Millrock, Millcreek, and Mr. Long, the court can reasonably infer that Mr. Smith and Millrock received an unjust benefit from the Plaintiffs' investment.

The court denies the Moving Defendants' motion to dismiss the Plaintiffs' unjust enrichment claim.

## VII.    Leave to Amend

Finally, the Plaintiffs argue that they should have the opportunity to amend if the court finds that any causes of action have been inadequately pled.  (ECF No. 113 at 9–10.)  The decision to grant or deny amendment is within the court's discretion, but "[r]efusing to leave to amend is generally only justified upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment."  Frank v. U.S. West, Inc., 3 F.3d 1357, 1365 (10th Cir. 1993).  "[I]n considering any motion to amend, the court must consider the balance between ensuring plaintiffs enjoy ample opportunity to plead their case and preventing prejudice to defendants who have to defend against multiple pleadings."  Gaddy v. Corp. of President of Church of Jesus Christ of Latter-Day Saints, 665 F. Supp. 3d 1263, 1300 (D. Utah 2023).

The court rejects the Plaintiffs' request on the grounds of delay, futility, and failure to cure deficiencies by amendments previously allowed.  This case is already nearly a year old.  "In the Tenth Circuit, untimeliness alone is an adequate reason to refuse leave to amend."  Duncan v. Manager, Dep't of Safety, Cty. & Cnty. of Denver, 397 F.3d 1300, 1315 (10th Cir. 2005) (citing Frank, 3 F.3d at 1365.  And as discussed above in the court's analysis of the Plaintiffs' state law securities fraud claims, the Plaintiffs have had multiple opportunities to amend their complaint based on the Defendants' prior motions to dismiss—their failure to do so indicates an inability to cure the deficiencies, making a third amended complaint futile.  And most importantly, even if some of the Plaintiffs' claims could be amended to meet the pleading standards, the court finds

that doing so will certainly prejudice Defendants, who have already been burdened by having to respond to the SAC.  For these reasons, the court denies the Plaintiffs' request to amend.

## ORDER

For the foregoing reasons, the court ORDERS as follows:

1.      The Defendants' motions to dismiss (ECF Nos. 105 & 109) are GRANTED IN PART and DENIED IN PART.

2.      The court DENIES the Defendants' motions to dismiss the Plaintiffs' first claim for violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5.

3.      The Plaintiffs' second claim for control person liability is DISMISSED WITH PREJUDICE against Mr. Smith.

4.      The Plaintiffs' third, fourth, and fifth claims for state law securities fraud are DISMISSED WITH PREJUDICE against all Defendants.

5.      The court DENIES the Defendants' motion to dismiss the Plaintiffs' sixth claim for common law fraud.

6.      The court DENIES the Defendants' motions to dismiss the Plaintiffs' seventh claim for negligent misrepresentation.

7.      The Plaintiffs' eighth claim for breach of fiduciary duty is DISMISSED WITH PREJUDICE against Mr. Smith and Millrock.

8.      The court DENIES the Defendants' motions to dismiss the Plaintiffs' ninth claim for unjust enrichment.

DATED this 7th day of August, 2025.

BY THE COURT:

Tena Campbell
United States District Judge